**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.

ELIZABETH SCHACHT, M.D.

      Plaintiff,

      v.

DENIS R. MCDONOUGH, Secretary,
U.S. Department of Veterans Affairs,

      Defendant.

_____

**COMPLAINT AND JURY DEMAND**
_____

Plaintiff Dr. Elizabeth Schacht, by and through her counsel Madeline A. Collison of

Benezra & Culver, P.C., and Marisa L. Williams of Williams & Rhodes, LLC alleges:

**INTRODUCTION**

1.      This is an employment discrimination suit brought by a former employee of the

U.S. Department of Veterans Affairs ("VA"). Dr. Schacht was employed as an anesthesiologist at

the Rocky Mountain Regional VA Medical Center located in Aurora, Colorado from 2015 until

August 20, 2018. when her clinical privileges were revoked, and she was removed from federal

service. Plaintiff Schacht brings claims of discrimination based on sex (female and pregnancy),

national origin (Colombian), disability (pregnancy related complications), and retaliation for her

prior EEO activity and her request for reasonable accommodation of her disability and FMLA

leave.

**JURISDICTION**

1.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343. This action is authorized and instituted pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"); the Americans with Disabilities Act, as amended, 42 U.S.C. § 12101 *et seq.* ("ADA"); the Rehabilitation act of 1973, as amended, 29 U.S.C. 791 *et seq.* ("Rehabilitation Act"); and the Equal Access to Justice Act, 28 U.S.C. § 2412, *et. seq.* ("EAJA").

2.      The employment practices alleged to be unlawful were committed within the jurisdiction of the United States District Court for the District of Colorado.

3.      The procedural prerequisites for the filing of this suit have been met, in that Plaintiff initiated the EEO Counseling process with the VA in a timely manner and filed a timely EEO Complaint with the VA.

**PARTIES**

4.      Plaintiff Dr. Elizabeth Schacht ("Plaintiff") is a is a citizen of the United States and a resident of and domiciled in the State of Colorado.

5.      At all times relevant hereto, Plaintiff was a federal civilian employee of the United States Department of Veterans Affairs, (hereinafter the "VA" or the "Agency").

6.      The VA operates multiple medical centers throughout the United States. At the time of the events at issue in this case, Plaintiff was employed by the Agency at the VA's Eastern Colorado Health Care System ("ECHCS"), now known as the Rocky Mountain Regional VA Medical Center located in Aurora, Colorado (the "RMR-VAMC").

7.     Defendant Denis R. McDonough is the Secretary of the U.S. Department of Veterans Affairs and, in that capacity, he is the appropriate nominal defendant for this action.

8.     The VA has continuously, and at all times relevant to this case, been an employer within the meaning of Title VII, the ADA, and the Rehabilitation Act.

**FACTUAL ALLEGATIONS**

9.     Plaintiff Dr. Elizabeth Schacht is female.

10.     Plaintiff is originally from Colombia.

11.     Plaintiff was employed as an anesthesiologist at the ECHCS located in Denver, Colorado from 2015 until her termination on August 20, 2018.

12.     Prior to the events at issue in this case, the VA and Plaintiff's supervisors were aware of Plaintiff's sex, which was both observable and a matter of Agency record.

13.     Prior to the events at issue in this case, the VA and Plaintiff's supervisors were aware of Plaintiff's national origin which she openly disclosed and was a matter of Agency record.

14.     Prior to the events at issue in this case, the VA and Plaintiff's supervisors were aware of Plaintiff's pregnancy and her need for accommodations due to pregnancy-related complications.

15.     In January 2018, Plaintiff formally disclosed to her supervisors that she was pregnant, had been diagnosed as having a high-risk pregnancy, and that she was experiencing pregnancy-related complications which required accommodations.

16.     Prior to the events at issue in this case, Plaintiff participated in statutorily protected activity in 2016 when she filed an administrative EEO discrimination complaint

against the VA.

17.    Prior to the events at issue in this case, the VA and Plaintiff's supervisors were aware of Plaintiff's prior protected activity as evidenced by the facts that: 1) she filed her EEO complaint with the VA's internal EEO Office; 2) the VA conducted an administrative investigation into the EEO complaint; 3) some of the same ECHCS (now RMR-VAMC) employees interviewed during the EEO investigation are directly involved as witnesses or alleged discriminating officials in the present action; and 4) the VA entered into a settlement agreement with the Plaintiff to resolve her prior EEO complaint.

18.    On February 14, 2018, Plaintiff filed a second administrative EEO discrimination complaint against the VA.

19.    Plaintiff's supervisors were aware of Plaintiff's 2018 protected activity as evidenced by the facts that: 1) she filed her second EEO complaint with the VA's internal EEO Office; 2) the VA conducted an administrative investigation into the EEO complaint; 3) some of the ECHCS (now RMR-VAMC) employees interviewed during the investigation of the 2018 EEO complaint are directly involved as witnesses or alleged discriminating officials in the present action.

20.    Plaintiff amended her second EEO Complaint on August 17, 2018 and August 24, 2018 after she was notified the VA had revoked her clinical privileges and removed her from federal service.

21.    Pursuant to 29 C.F.R.§ 1614.407(b), a complainant may file a civil action in federal court when the agency has not taken final action within 180 days from date she filed her administrative discrimination complaint. In this case, Plaintiff's EEO Complaint, EEOC Case

No. 541-2022-00100X, has been pending before the EEOC for more than five years.

22.    The procedural prerequisites for the filing of this suit have been met as Plaintiff filed timely EEO Complaints and has exhausted the required administrative prerequisites.

**Plaintiff is Subjected to Different Terms and Conditions of Employment than her Male Peers Shortly After She Starts her Employment in 2015.**

23.    Dr. Schacht has been licensed to practice medicine since 2010. She did her residency in Anesthesiology at the University of Miami, then completed subspecialty training in Critical Care Medicine at Harvard Medical School and in Cardiac Anesthesiology at Texas Heart Institute. Dr. Schacht is triple board certified, including in Anesthesiology, Critical Care Medicine and Advanced Perioperative Transesophageal Echocardiography.

24.    Dr. Schacht began her employment as an anesthesiologist at the VA ECHCS in March, 2015.

25.    Dr. Schacht was the only female anesthesiologist on staff at the during her employment from May 2015 until August 2018.

26.    From the start of her employment with VA ECHCS, Dr. Schacht was subjected to different terms and conditions of employment as compared to her male peers.

27.    Dr. Schacht was assigned to the ECHCS Cardiac Care team. The team was comprised of only three doctors, Plaintiff, Dr. Daniel Beck (male, national origin and disability status unknown) and Dr. Wayne Soong (male, national origin and disability status unknown). Of the three Anesthesiologists assigned to the team, only Plaintiff had fellowship training in two subspecialties relevant to the Cardiac Care team (Cardiac Anesthesiology and Critical Care). Dr. Beck was Cardiac trained and Dr. Soong was Critical Care trained (he was allowed to do cardiac

cases even though he was not Cardiac trained). Despite her requests for cardiac anesthesia cases, her superior training and the fact that Dr. Schacht needed to do cardiac anesthesia cases to maintain her certifications and clinical privileges requirement in her specialty, the VA assigned cardiac anesthesia cases to her male colleagues on a much more frequent basis.

28.     Unlike her male peers, Dr. Schacht was excluded from participating in anesthesia and critical care committees despite expressing an interest in the same.

29.     Unlike her male peers, Dr. Schacht was also excluded from interviews of prospective candidates to join the Surgical Intensive Care Unit  in the Anesthesiology Department.

30.     Dr. Schacht was allowed significantly less time to devote to academic pursuits than her male peers. For example, she was only guaranteed 5% of her time to be devoted to academic pursuits while her male peers were guaranteed between 15 and 30% of their time for academic pursuits.

31.     Despite having received a good performance evaluation for the first six months of her employment, the Chief of Anesthesiology elected to keep Dr. Schacht on a Focused Professional Practice Evaluation ("FPPE") which is only used for new employees and requires more focused oversight of the doctor.

32.     When Dr. Schacht inquired as to why the Chief of Anesthesiology was keeping her on a FPPE, she was told that it was because she got married and changed her name.

33.     Further, Dr. Schacht's immediate supervisor told her that medical staff is likely "not used to people like you, you Latin women are so passionate they think that you're mad at them."

34.    Dr. Schacht's national origin was also referenced during her interactions with her male colleagues who often referred to her as being a typical "hot headed temperamental Latina."

**Dr. Schacht Initiates her First EEO Complaint in December 2016.**

35.    On or about December 25, 2016, Dr. Schacht initiated the informal EEO complaint counseling process.

36.    In February 2017, Dr. Schacht and then Chief of Anesthesiology Dr. Gurdev Rai attended an EEO Mediation and entered into an EEO Settlement Agreement dated February 21, 2017 whereby the Agency agreed, among other things, to conclude Dr. Schacht's FPPE by March 31, 2017 and to more equitably assign cardiac cases.

37.    The February 21, 2017 EEO Settlement Agreement was signed by Dr. Rai, Chief of Anesthesiology and Sallie Houser-Hanfelder, Medical Center Director.

38.    In the summer of 2017, the Agency began an investigation into the Anesthesiology Department based on allegations of a hostile work environment, bullying and Harassment. During the investigation, Dr. Schacht raised her concerns regarding the disparate treatment that she had been receiving despite the promises made to her in the EEO Settlement Agreement.

39.    During the investigation, Dr. Schacht also raised other concerns regarding the Anesthesiology department, specifically including what appeared to be improper staffing practices by other doctors that were negatively affecting patient care. The Office of Medical Investigator ("OMI") conducted an investigation into these practices and subsequently issued a report to Congress as to its findings.

40.    On September 16, 2017, the fact-finders and the Agency's Human Resources

Office recommended an Administrative Investigation Board ("AIB") be convened to address the disruptive hostile work environment in the Anesthesiology Department which was compromising patient safety. The Agency refused to conduct an AIB "for fear of worsening an already unstable situation."

41.    Needless to say, reporting her concerns regarding sex/national origin discrimination and other problems within ECHCS did not endear Dr. Schacht to Agency leadership.

42.    In the fall of 2017, after Dr. Schacht reported her concerns regarding sex/national origin discrimination and the Agency's failure to abide by the terms of the EEOC agreement, the Agency management began a campaign to get rid of her.

43.    For example, in October 2017, individuals in positions of authority over the University of Colorado resident training program at ECHCS, solicited negative comments about Dr. Schacht from the residents. The solicitation yielded only four complaints, and those complaints were anonymous, undated, vague and contained only generic allegations of unprofessionalism against Dr. Schacht.

44.    Contrary to the four solicited and anonymous resident complaints, the numerous contemporaneous reviews posted by the University residents on MedHub (the official online program where residents can evaluate the attendings that they have worked with) were quite favorable to Dr. Schacht. Specifically, she was rated as exceeding expectations in six of nine categories, as meeting expectations in the other three, as solidly exceeding expectations overall and she received additional positive comments from at least twelve residents.

45.     In addition, the MedHub comments were to the effect that she was always available when needed and was outstanding in terms of instructing residents, including in the OR and PACU.

46.     The allegations of unprofessionalism were never investigated by the University of Colorado or the VA, much less corroborated. Significantly, the Agency did not inform Dr. Schacht about any supposed resident concerns at the time, and it did not take any action to limit, stop or interfere in any way with her continued supervision of Agency residents for several months thereafter.

47.     In the fall of 2017, VA management intensified its scrutiny of Dr. Schacht's cases to try to find reasons to get rid of her. Specifically, Agency management selected certain of Dr. Schacht's cases for review by three VA anesthesiologists who were the Chiefs of Anesthesiology at other VA facilities in hopes they would find she had provided substandard care. Armed with such findings, the VA could argue it had a legitimate reason to take adverse action against her, up to and including removal.

48.     Unfortunately for VA management, all the outside reviewers concluded that Dr. Schacht had met the standard of care in each of the cases reviewed.

49.     Dr. Schacht was often treated in a disrespectful, dismissive and even hostile manner by her male peers. For example, on December 17, 2017, Dr. Carlton Barnett, a VA surgeon with whom Dr. Schacht worked on a regular basis, snapped at Dr. Schacht and made threatening remarks that he was going to report her and make sure she lost her medical license for making clinical recommendations about "his patient."

50.     Dr. Barnett raised his voice and waved his arms in Dr. Schacht's face in front of a

critically ill veteran, his family members and hospital staff.

51.    Dr. Barnett's demeanor was so aggressive that the clerk working in the unit at the time approached Dr. Barnett in an attempt to defuse the situation and then escorted Dr. Barnett out of the unit.

52.    Dr. Barnett went on to write negative and unprofessional remarks about Dr. Schacht in the patient's chart.

53.    Dr. Schacht verbally informed management of the incident with Dr. Barnett when she reported the same to her supervisor, Dr. Ian Black. She also sent an email containing a detailed description of the incident to both Dr. Black and Medical Chief of Staff Dr. Ellen Mangione.

54.    Some of the witnesses to the incident also informed management about Dr. Barnett's misconduct and mistreatment of Dr. Schacht, including a bedside nurse who wrote a Note in the patient's chart describing the incident and two nurse practitioners who each filed Reports of Contact regarding the incident.

56.    Dr. Schacht also reported Dr. Barnett's medical mismanagement of the veteran in question, including the fact that Dr. Barnett and his team refused to perform basic labs and X-rays for the critically ill veteran for several days, which resulted in profound anemia and a severe infection being unrecognized and left untreated.

**Dr. Schacht Initiates her Second EEO Complaint in December 2017**

57.    After the incident with Dr. Barnett, on or about December 27, 2017, Dr. Schacht contacted the Agency's EEO Counselor to report her continuing concerns regarding discrimination and reprisal.

10

58.     On December 21, 2017, Dr. Schacht made a formal complaint regarding Dr. Barnett's inappropriate conduct and sent it to the Chief of Anesthesiology, Dr. Ian Black and the Chief of Medical Staff, Dr. Ellen Mangione.

59.     On January 11, 2018, Plaintiff disclosed to her supervisor, Dr. Ian Black and the HR Specialist, Alix Gard that she was experiencing a high-risk pregnancy, and she submitted a note from her obstetrician describing the pregnancy-related complications she was experiencing. The obstetrician's note requested reasonable accommodations for Plaintiff's pregnancy-related disability.

60.     Dr. Schacht's obstetrician stated that Dr. Schacht's disability was due to placenta previa/placenta abruption. Dr. Schacht's physician noted that the disability began in January 2018, and was expected to last until her delivery on or about May 2, 2018.

61.     Due to the pregnancy-related disability, Dr. Schacht was instructed by her doctor to avoid lifting or pushing heavy objections and to limit physical activity.

62.     Dr. Schacht was also instructed to limit her working hours to 8 hours daily and to minimize her exposure to surgical cases requiring radiation.

63.     Dr. Schacht's obstetrician specifically requested that her exposure to radiation be limited while she was pregnant. Having to wear a heavy lead gown (weighing at least 10 pounds, or more than 10 times the weight of the fetus as noted in her ultrasound at the time) for radiation protection triggered pre-term contractions and bleeding, posing an imminent threat to her welfare and that of her unborn child.

64.     Dr. Schacht was able to perform her job duties with reasonable accommodation.

65.     Despite Dr. Schacht's request for reasonable accommodation, and despite the fact

she had eight male colleagues who could have been assigned to any cases that required radiation exposure, the Agency continued to assign her cases requiring such exposure.

66.    Shortly after Dr. Schacht disclosed her pregnancy-related disability and requested Accommodations, and after she reported her discrimination and reprisal concerns to the EEO Counselor, VA management (having been unable to make a case against Dr. Schacht on the basis of her professional competence), charged her with unprofessional conduct.

67.    After making her EEO complaint, Dr. Schacht was subjected to two adverse peer reviews in just eight days. Both cases were evaluated by external reviewers who determined she had met the standard of care. Nevertheless, the Agency relied on these two cases when it later proposed to remove Dr. Schacht.

68.    In mid-January 2018, months after it had secured the four negative resident complaints, the Agency told Dr. Schacht that she was no longer going to be allowed to supervise residents due to unspecified, anonymous "resident complaints."

69.    On January 29, 2018, Dr. Schacht entered a room during a procedure that (unbeknownst to her) required intermittent radiation. When she realized radiation was being used, Dr. Schacht was alarmed and she requested a brief cessation of the intermittent fluoroscopy rather than putting on a heavy lead gown for protection. A request to do so for a minute or two was not at all unreasonable under the circumstances.

70.    In January and February 2018, Dr. Schacht attempted to meet with officials regarding the alleged resident complaints but she was never provided any of the specifics that would have enabled her to provide an informed response to the complaints.

71.    On February 14, 2018, the same day Dr. Schacht filed her formal EEO complaint,

the Agency summarily suspended her clinical privileges and removed her from all clinical duties because she allegedly posed "an imminent threat to patient safety."

72.    The notice of summary suspension issued to Dr. Schacht relied upon the same allegations that were included in a proficiency report the Agency claims to have issued on October 31, 2017. However, Dr. Schacht did not receive the proficiency report until March 15, 2018,while she was on FMLA and  a full month after the Agency imposed the summary suspension.

73.    After receiving the notice of summary suspension on February 14, 2018, Dr. Schacht made a verbal request to Dr. Ian Black to have the opportunity to provide an informed and meaningfully response to the allegations against her.

74.    Dr. Black responded that he did not have any evidence to support the suspension of Dr. Schacht's clinical privileges but he was going to investigate the situation.

75.    The ensuing investigation was clearly designed to find any evidence the Agency could use to remove Dr. Schacht, and it included not only the four resident complaints, but also the two cardiac surgery cases the Agency had previously submitted to external reviewers (even though the reviewers determined Dr. Schacht had met the standard of care.

76.    During the processing of her EEO complaint, Dr. Schacht learned that Dr. Black had been soliciting complaints about Dr. Schacht from his subordinates. Moreover, he gave those employees a financial incentive to file complaints against Dr. Schacht by offering to pay them overtime if they stayed late to file those complaints.

77.    On February 16, 2018, Dr. Schacht, through her attorney, sent correspondence to the Director of the VA requesting to be provided with the specific allegations that were being

used as the basis for the adverse action against her.

78.     On or about February 16, 2018, Dr. Schacht's union representative, Bernard Humbles, also submitted a written request for the same information.

79.     The limited information provided to Dr. Schacht regarding the administrative investigation lacked meaningful information and details regarding the allegations against her.

80.     On March 9, 2018, Dr. Schacht's attorney requested an in-person interview about the allegations the purportedly supported the summary suspension, but the Agency denied that request.

81.     Due to her pregnancy-related complications, Dr. Schacht took FMLA leave beginning on March 15, 2018.

82.     The Agency disregarded the fact that Dr. Schacht was on FMLA leave due to her high-risk pregnancy and continued the investigation. As a result, Dr. Schacht could not follow her doctor's instruction to remain on bed-rest because she had to travel to the hospital several times to secure letters of support and to access her VA e-mail to secure and submit supporting documentation in response to the allegations against her.

83.     Dr. Schacht submitted her concerns to Dr. Black and requested a stay in the investigative process, but her request was denied.

84.     Although the Agency's evidence file was apparently completed by March 15, 2018, the VA did not provide the file to Dr. Schacht, denying her the opportunity to provide an informed response.

85.     The Agency issued a letter dated August 1, 2018 to Dr. Schacht notifying her that it proposed to remove her from federal service and revoke her clinical privileges based on a

charge of "unprofessional conduct."

86.     The Agency provided Dr. Schacht with the August 1, 2018 proposal letter on August 3, 2018. The proposal letter included eight specific allegations in support of the proposed removal and revocation.

87.     The VA informed Dr. Schacht that she had only 7 business days to review the 200 pages of documentation the Agency allegedly relied upon to support the adverse action and to respond to the proposed removal.

88.     Dr. Schacht provided both a verbal response and a written response to the proposed removal action on August 14, 2018.

89.     Although VA Director Sally Houser-Hanfelder did not sustain all eight of the specifications alleged in support of the Unprofessional Conduct charge, on August 20, 2018, she issued a decision removing Dr. Schacht from federal service and revoking her clinical privileges.

90.     Dr. Schacht appealed her removal from federal service and the revocation of her clinical privileges to the VA Disciplinary Appeals Board ("DAB"). More than one year later, in December 2019, a DAB panel of three male physicians heard Dr. Schacht's appeal. The panel did not, however, allow Dr. Schacht to present evidence in response to the charge against her.

91.     In July, 2020, Dr. Schacht learned the DAB affirmed the VA's decision to remove Dr. Schacht from federal service and revoke her clinical privileges.

92.     Dr. Schacht has appealed the DAB decision and the case is currently pending before the U.S. Court of Appeals for the District of Columbia.

93.     On March 2, 2021, the VA submitted a complaint regarding Dr. Schacht to the

Colorado State Medical Board outlining the same allegations it had relied upon to terminate her. However, despite the fact the Agency had charged and removed Dr. Schacht for her allegedly "Unprofessional Conduct," not her clinical competence, its complaint to the State Medical Board the VA alleged that Dr. Schacht "Significantly failed to meet generally accepted standards of clinical practice to raise reasonable concern for the safety of patients."

94.     On April 22, 2021, Dr. Schacht was notified that after thorough review and discussion, the Colorado State Medical Board determined that there were insufficient grounds to warrant the commencement of formal disciplinary proceedings pursuant to the Medical Practice Act.

95.     On September 20, 2022, the VA reported the adverse action it had taken against Dr. Schacht to the National Practitioner Database ("NPDB"). The NPDB report was transmitted to the Colorado Medical Licensing Board, prompting yet another inquiry into the VA's actions against Dr. Schacht.

96.     On December 16, 2022, Dr. Schacht was notified that after thorough review and discussion, the Colorado State Medical Board determined that there were insufficient grounds to warrant the commencement of formal disciplinary proceedings based on the complaints filed by the VA. Accordingly, the Board dismissed the complaint against Dr. Schacht.

**The VA Treated Dr. Schacht Much More Harshly than Similarly Situated Male Physicians at the VA ECHCS.**

97.     Although the VA ECHCS accused Dr. Schacht of failing to meet generally accepted standards of clinical practice and causing concern for the safety of patients, none of Dr. Schacht's patients at the VA ever experienced an adverse outcome as a result of the care she

provided them during her tenure at the VA ECHCS. Further, Dr. Schacht has never been named in a malpractice lawsuit and, despite the VA's efforts to the contrary, Dr. Schacht has never been subjected to licensing discipline by any Medical Board.

98.    Unlike Dr. Schacht, male physicians at the VA ECHCS who were similarly situated to her were proved to have provided substandard care and/or had patients who had experienced adverse outcomes, yet the VA took less severe or no disciplinary action against them.

99.    For example, Dr. Mario Villasenor,  a male physician at ECHCS, had two intraoperative deaths within a short period of time that could have been avoided with appropriate intervention. The first patient died after a nonemergent surgical procedure with active symptoms of coronary artery disease and was not on any medical treatment at the time. The second patient died a few months later during emergent vascular surgery anticipating large volume loss. Suboptimal perioperative management, including inadequate vascular access and lack of blood availability contributed to his death.

100.    Despite very obvious treatment concerns regarding the care provided by this  male physician, the Agency did not take any disciplinary action against him.

101.    In another instance, Timothy  Christie, a male Certified Registered Nurse Anesthetist  ("CRNA") who was under the supervision of anesthesiologist Dr. Sean Shockey, was caring for a patient undergoing thyroidectomy. The patient's endotracheal tube came out in the middle of surgery due to inadequate taping by the CRNA. The surgical team was not able to reintubate the patient, so they performed an emergent tracheostomy, which was complicated with

subsequent tracheal stenosis. Despite the clearly substandard care this male CRNA provided, he did not face any disciplinary action.

**Dr. Douglas Semian.**

102.    A primary comparator for Dr. Schacht's case is Dr. Douglas Semian, a male of U.S. origin (disability status unknown). Dr. Semian was a Critical Care Provider in the Surgical Intensive Care Unit ("SICU") at ECHCS, functioning as the in-house Physician during the evenings. Dr. Semian was a fellow Physician to Dr. Schacht within the SICU, he worked in the same location and he reported to the same chain of command as Plaintiff, including the Chief of Staff, Dr. Ellen Mangione (the proposing official for Dr. Schacht's removal).

103.    Since its inception in 2014, the SICU was under the leadership of the Anesthesiology Department. As such, Physicians caring for patients in the SICU (including both Drs. Schacht and Semian) reported to the Chief of Anesthesiology. During the relevant period of time, the ECHCS had three different doctors serve as the Chief of Anesthesiology: Dr. Gurdev Rai, Dr. Sean Shockey and Dr. Ian Black.

104.    Because both Dr. Schacht and Dr. Semian were medical providers at VA ECHCS who provided care to patients in the same service area, they were subject to the same set of professional and medical standards with respect to their performance and conduct.

105.    Multiple complaints about Dr. Semian were submitted to the Chief of Anesthesiology, including Drs. Gurdev Raj, Sean Shockey and Ian Black.

106.    For example, on or around August 16, 2016, a complaint about Dr. Semian was submitted to then Chief of Anesthesiology, Dr. Gurdev Rai. The complaint described the SICU nursing staff's inability to communicate with Dr. Semian – he was ignoring phone calls from the

SICU staff and he failed to evaluate a veteran experiencing life threatening hypoxia and hemodynamic instability in a timely manner.

107.    On or about September 6, 2017, there were multiple reports of Dr. Semian's altercation with another member of the Critical Care team. The incident took place in front of other staff members, critically ill veterans, and family members. The altercation was so serious that it required police intervention. Further, as a result of this incident, the patient hand-off process that is required to transition care of critically ill veterans to a new team was disrupted.

108.    In December 2017 and January 2018, two separate Patient Safety Reports were made to Dr. Black regarding Dr. Semian's refusal to comply with the hand-off policy required for transition of care of critically ill veterans. As the reporting party explained in the January Report, "This is a patient safety issue as I have discovered patients who were critical in the am coming on and information was not passed on to me which is pertinent to patient care."

109.    The December Patient Safety Report also raised concerns about Dr. Semian's failure to manage a veteran's life-threatening respiratory distress, that SICU staff was afraid to call Dr. Semian about patient care issues due to his unresponsiveness and his aggressive demeanor when he did respond to them, and his failure to diagnose and treat abnormal findings that required immediate attention from an MD.

110.    Despite receiving these significant behavior and competency concerns about Dr. Semian over a six month period of time, it was not until on or about January 17, 2018, that Dr. Black proposed any discipline for Dr. Semian. Then, unlike the proposal issued to Dr. Schacht, Dr. Semian was not proposed for removal. Instead, Dr. Black proposed a 3-day suspension.

111.    The VA ECHCS Director, Ms. Houser-Hanfelder, sustained Dr. Black's proposed

discipline and on or around February 2, 2018, she issued a decision upholding the 3-day suspension of Dr. Semian.

112.    The three day suspension had little or no effect on Dr. Semian's performance or conduct. On or around May 31, 2018, another complaint was made regarding Dr. Semian's refusal to communicate with the other members of a veteran's care team. In this case the veteran was having a stroke. Dr. Semian not only failed to communicate with the care team; he demonstrated a lack of clinical competence because he failed to diagnose and treat the veteran who was experiencing this life-threatening condition.

113.    On or about October 21, 2018, an additional complaint was filed against Dr. Semian alleging that he engaged in misconduct when he refused to evaluate and treat both a veteran with life-threatening alcohol withdrawal and another veteran with hemodynamic instability and respiratory distress.

114.    In addition to the multiple instances identified above where Dr. Semian provided patients with substandard care, he also engaged in unprofessional, hostile and abusive behavior.

115.    For example, On October 19, 2018, Dr. Semian became angry with a nurse practitioner when she asked if she could have his sign-out sheet. Dr. Semian lashed out against the nurse practitioner in front of a student and the student was so affected by Dr. Semian's hostile conduct that she sent the nurse practitioner a link where she could find recommendations on how to manage hostile physicians.

116.    On October 20, 2018, Dr. Semian failed to report for duty by 6:00 AM, as required. When he did arrive, Dr. Semian proceeded to disparage a nurse practitioner and he refused to give her student a necessary report.

117. On or about October 26, 2018, another complaint was filed about Dr. Semian, reporting, "He's dangerous, doesn't understand critical care or basic medicine as evidenced by many prior reports and witnessed that morning." Other staff members had raised similar concerns asking: "Is that guy always an idiot? Does he even look at the patient?" "When is something going to be done about this?"

118. Despite the fact the VA had already taken disciplinary action against Dr. Semian (the three day suspension) in February 2018, and the fact that he continued to engage in egregious behavior and compromise patient care, the VA took no further action against Dr. Semian until it issued him a summary suspension of clinical privileges on February 15, 2019, and again on March 19, 2020.

119. During the fall of 2019, an investigation into Dr Semian substantiated concerns regarding his clinical practices. In contrast, the investigation by three different external reviewers into Dr Schacht's clinical care concluded that the Standard of Care was met in all cases reviewed.

120. When the VA's treatment of Dr. Semian is compared to the treatment it gave Dr. Schacht, it is manifest that the Agency subjected Dr. Schacht to much harsher treatment for (alleged) performance and conduct issues that were far less serious and did not compromise patient care. Unlike Dr. Schacht, Dr. Semian's clinical privileges were never revoked nor was he removed from federal service.

121. While the VA ultimately reported Dr. Semian to the Louisiana State Licensing Board for substandard clinical practice, it did so only after a Fact-Finding Investigation by higher leadership concluded he had, in fact, provided substandard care.

122.    In Dr. Schacht's case, however, the VA reported her to the Colorado State Licensing Board on two occasions without any such finding.

123.    In addition to Dr. Semian, multiple similarly situated male physicians at the VA ECHCS exhibited unprofessional, hostile, and/or disruptive behavior and insubordination, yet the VA took less severe or no disciplinary action against them.

**Dr. Christopher Frandrup**

124.    Another comparator for Dr. Schacht's case is Dr. Christopher Frandrup (male, U.S. origin, disability status unknown). Like Dr. Schacht, Dr. Frandrup was an Anesthesiologist at the VA ECHCS. Drs. Schacht and Frandrup shared the same position, duties, location, and reporting structure. Further, because Drs. Schacht and Frandrup provided care to patients in the same service area, they were subject to the same set of professional and medical standards with respect to their performance and conduct.

125.    Similar to Dr. Schacht, the Agency removed Dr. Frandrup in September 2017 based on an "Unprofessional Conduct" charge. Dr. Frandrup, however, engaged in far more egregious behavior than that alleged against Dr. Schacht. Specifically, the VA alleged that Dr. Frandrup reported to an emergency surgery while on call duty under the influence of alcohol.

126.    The VA reinstated Dr. Frandrup to his full-time position at the VA ECHCS on March 16, 2018. Despite having been previously removed for misconduct, Dr. Frandrup promptly resumed his reckless and aggressive behavior towards coworkers and veterans during the performance of his clinical duties.

127.    By approximately November 2018, Dr. Frandrup's conduct had become sufficiently disruptive that it compromised patient care. As nursing staff testified, Veterans were

so afraid of being in the care of Dr. Frandrup that they requested to be cared for by a different anesthesia provider.

**Dr. Wayne Soong**

128.    Dr. Wayne Soon (male, U.S. origin, disability status unknown) is another comparator for Dr. Schacht's case. Like Dr. Schacht, Dr. Soong was an Anesthesiologist at the VA ECHCS. Drs. Schacht and Soong shared the same position, duties, location, and reporting structure. Further, because Drs. Schacht and Soong provided care to patients in the same service area, they were subject to the same set of professional and medical standards with respect to their performance and conduct.

129.    Dr. Soong began working at ECHCS in March of 2015 and remains employed at the Agency.

130.    Dr. Soong engaged in misconduct that had a direct impact on patient care. Like several of his peers in the Anesthesiology department, he refused to fulfill his clinical responsibilities as an Intensivist. Among other things, Dr. Soong and the other, male Anesthesiologists falsely claimed credit for hours they were not at work and they refused to work post call days, threatening to resign if they were compelled to do so.

131.    According to a report issued by the Office of Medical Inspector ("OMI"), the Anesthesiologists who refused to fulfill their clinical responsibilities (Dr. Soong and several of his peers) caused the Agency to cancel hundreds of surgeries that had been scheduled for veterans.

132.    The OMI calculated that the number of patients it estimated were affected by the cancellations was a gross underestimate. Nonetheless, the evidence demonstrates that at least

232 veterans were affected by Dr. Soong's and his colleagues' misconduct.

133. As described in the "Table of Penalties for Title 5 and Title 38 employees" set forth in VA Handbook 5021/15, Part I, the deliberate failure or refusal of a VA employee to fulfill his assigned job responsibilities unequivocally constitutes actionable misconduct punishable by discipline up to and including removal. In addition, falsifying attendance records also constitutes actionable misconduct punishable by discipline up to and including removal. Despite his actionable misconduct, Dr. Soong was never disciplined. To the contrary, the VA subsequently promoted him to serve as the Interim Chief of Anesthesiology.

**Dr. Daniel Beck**

134. Dr. Daniel Beck (male, U.S. Origin, disability status unknown) is another ECHCS Anesthesiologist who reported to the same chain of command as Plaintiff. Dr. Beck and Dr. Schacht also shared the same position, duties and location. Further, because Drs. Schacht and Beck provided care to patients in the same service area, they were subject to the same set of professional and medical standards with respect to their performance and conduct.

135. Dr. Beck began working at ECHCS in or about 2012. Like Dr. Soong, Dr. Beck falsely claimed credit for hours he was not at work, refused to fulfill his duty to work post call days and threatened to resign if he was required to do so. As described in paragraphs 131-132 above, the OMI report concluded the refusal to fulfill clinical responsibilities contributed to the cancellation of hundreds of veterans' scheduled surgeries and affected significantly more veterans than those identified.

136. As described in paragraphs 131-133 above, Dr. Beck's actions constitute misconduct punishable by discipline up to and including removal. However, Dr. Beck was

never disciplined for his unprofessional conduct. Dr. Schacht, on the other hand, was subject to revocation of her clinical privileges and removal based on allegations of significantly less egregious acts.

**Dr. Mario Villaseñor**.

137.    Dr. Mario Villaseñor (male, U.S. Origin, disability status unknown) is a comparator for the same reasons as Dr. Beck and Dr. Soong. He engaged in the same misconduct as Drs. Beck and Soong, but he was not disciplined. Dr. Schacht was subject to revocation of her clinical privileges and removal based on allegations of significantly less egregious acts.

**Dr. Sean Shockey**

138.    Dr. Sean Shockey (male, U.S. Origin, disability status unknown) was the former Chief of Anesthesiology at the ECHCS and reported to the Chief of Staff, Dr. Ellen Mangione, the proposing official for Dr. Schacht's removal. As the Chief of Anesthesiology, Dr. Shockey's duties were sufficiently similar to those of Dr. Schacht to render him a comparator for purposes of this complaint. As medical providers within the VA ECHCS, Drs. Shockey and Plaintiff were subject to the same set of professional and medical standards.

139.    However, as a department chief, Plaintiff submits he should have been held to a higher standard.

140.    Similar to Drs. Soong, Beck and Villaseñor, Dr. Shockey refused to fulfill his duty to work post call days and threatened to resign if he was required to do so. According to the OMI report, this refusal to fulfill his clinical responsibilities contributed to the cancellation of hundreds of surgeries scheduled for veteran patients.

141.     As the Interim Chief of Service, Dr. Shockey had decision-making authority. In this capacity, Dr. Shockey encouraged members of the Anesthesia team to refuse to work post-call days and threaten resignation. He also contributed to the creation of deceptive coding to hide the fraudulent post-call practices he encouraged. More specifically, Dr. Shockey instructed Anesthesia team members to "*Just put 'OR' blank hours on the schedule. Problem solved.*"

142.     According to the OMI report, this refusal to fulfill his clinical responsibilities contributed to the cancellation of hundreds of surgeries scheduled for veteran patients. OMI also determined that the calculated number of patients was a gross underestimate.

143.     Despite Dr. Shockey's misconduct, he received no form of discipline, let alone suspension of his clinical privileges or removal from employment. In fact, Dr. Shockey was later promoted and became the Chief of Anesthesiology at the VA in Cheyenne, Wyoming.

**Dr. John Eun**

144.     Dr. John Eun (male, U.S. Origin, disability status unknown) was a fellow Physician in the Vascular Surgery department who also reported to the Chief of Staff, Dr. Ellen Mangione,the proposing official for Dr. Schacht's removal.

145.     As a Physician, Dr. Eun's duties related to the provision of direct medical care to patients, including the SICU and the Operating Room. He worked in the same location as Dr. Schacht and he was subject to the same set of professional and medical standards. Based on these facts, Dr. Eun is a proper comparator to Dr. Schacht.

146.     Dr. Eun began working at ECHCS sometime before Dr. Schacht arrived and he continues to work at ECHCS.

147.     ECHCS employees submitted numerous complaints about Dr. Eun's

26

unprofessional conduct and inappropriate communication with other team members regarding patient management while veterans were admitted in the SICU.

148.    For example, on March 25, 2017, Dr. Soong wrote a Report of Contact regarding Dr. Eun's behavior in the SICU. He explained that Dr. Eun spent about 30 minutes out of an entire week in the SICU, none of which was productive towards clinical care, team communication, or patient and family counseling. He also described Dr. Eun's "passive-aggressive tantrums" about various aspects of patient care directed at nursing, the critical care team, or his own house staff.

149.    Dr. Eun received no form of discipline, let alone suspension of his clinical privileges or removal from employment for his misconduct. Dr. Schacht was subject to both adverse actions based on allegations of significantly less egregious acts.

**Dr. Phillip Pian**

150.    Dr. Phillip Pian (male, U.S. Origin, disability status unknown) was yet another Anesthesiologist who worked at ECHCS. Like Plaintiff, he reported to the Chief of Anesthesiology, Drs. Shockey and Black, and ultimately to Chief of Staff Dr. Mangione, the proposing official for Dr. Schacht's removal.

151.    Dr. Pian began working at ECHCS at some point before Dr. Schacht arrived. As a physician, Dr. Pian was subject to the same set of professional and medical standards as Dr. Schacht.

152.    Dr. Pian engaged in an altercation with other Anesthesia team members, yelling profanities in a hallway leading to the operating room in front of veterans and family members. His behavior was so concerning that the police were called to intervene.

153.    Despite Dr. Pian's misconduct, he received no form of discipline, let alone a suspension of his clinical privileges or removal from employment. Dr. Schacht was subject to both adverse actions based on allegations of significantly less egregious acts.

**Dr. Peter Sottille**

154.    Dr. Peter Sottille (male, U.S. origin, disability status unknown) was a Physician with clinical responsibilities in the ECHCS SICU. Dr. Sottille also reported to Chief of Staff, Dr. Ellen Mangione, the proposing official for Dr. Schacht's removal.

155.    As a Physician, Dr. Sotille was subject to the same set of professional and medical standards as Dr. Schacht.

156.    On February 15, 2018, a nurse practitioner made a report regarding Dr. Sottille's refusal to appropriately hand-off patient care to the incoming team and to enter orders into the computer. Patient hand-off is an essential process designed to transfer critical information regarding patient care to the incoming medical team (e.g., critical laboratory results, changes in patient's clinical status, goals of care during the shift, etc.).

157.    Despite Dr. Sottille's misconduct, he received no form of discipline, such as a suspension of his clinical privileges or removal from employment. Dr. Schacht was subjected revocation of her privileges and removal based on allegations of far less egregious conduct.

**Dr. Carlton Barnett**

158.    Dr. Carlton Barnett (male, U.S. origin, disability status unknown) was a Physician whose clinical responsibilities included caring for patients in the ECHCS Operating Room and the SICU. Dr. Barnett ultimately reported to the Chief of Staff, Dr. Ellen Mangione, and as a Physician, he was subject to the same set of professional and medical standards as Dr. Schacht.

159.    Dr. Barnett refused to honor a veteran's wish to be made comfortable while suffering severe anguish and his request to be transferred to a facility closer to his friends and family members before he passed away. Further, Dr. Barnett dismissed the veteran's repeated requests that he not be indefinitely subjected to aggressive  and futile artificial life sustaining treatment.

160.    Dr. Barnett's refusal to honor the veteran's wishes resulted in the palliative care team signing off patient care. In addition, Dr. Barnett refused to perform the most basic labs and monitoring required by any critically ill patient.

161.    Dr. Barnett's treatment of this veteran was reported to Agency management by multiple staff members, including Dr. Schacht, who witnessed his conduct. However, VA management failed to intervene on behalf of the patient, who suffered a horrible and lonely death in the SICU, away from his family members and friends, a few days after Dr. Schacht and other employees reported Dr. Barnett's conduct.

162.    As described in paragraphs 159 and 160 above, while Dr. Barnett was refusing the dying veteran's requests, he also engaged in unprofessional conduct when he snapped at Dr. Schacht and made threats against her in front of the veteran, his family members and the staff who were present because she suggested care options for "his patient."

163.    Dr. Barnett also engaged in unprofessional conduct when he wrote derogatory comments about Dr. Schacht in the patient's file. While the VA later had the comments removed, it took no disciplinary action against Dr. Barnett for his mistreatment of the dying veteran or his misconduct towards Dr. Schacht.

164.    In addition, male physicians at ECHCS, including Dr. Larry Robbins, Chief of

Geriatrics and Dr. Michael Stone, Chief of Radiology and Imaging, had received multiple

complaints from residents. While they were no longer allowed to supervise residents, the Agency

did not subject them to disciplinary action or removal.

165.    Assuming *arguendo* that Dr. Schacht had in fact engaged in the conduct the

Agency accused her of, the evidence clearly demonstrates that she received much more severe

discipline for conduct that was significantly less egregious than that of her male, U.S. born and

presumably non-disabled peers.

## FIRST CLAIM FOR RELIEF
**(Discrimination Based on Sex/Pregnancy/National Origin in Violation of Title VII)**

166.    The foregoing allegations are realleged and incorporated herein by reference.

167.    As described in ¶¶ 9 and 10 above, Plaintiff is female who is originally from

Colombia.  She is therefore a member of at least two statutorily protected classes based on her

sex and her national origin.

168.    As described in ¶¶ 12 and 13 above, the VA and Plaintiff's supervisors were

aware of Plaintiff's sex and national origin before the events at issue in this case took place.

169.    As described in ¶¶  59 to 64 above, Plaintiff also disclosed her pregnancy to her

supervisors and requested accommodations for her pregnancy.

170.    Defendant subjected Plaintiff to less favorable terms and conditions of her

employment based on her sex/pregnancy  and/or national origin. This treatment included but is

not limited to: subjecting Plaintiff to less favorable terms and conditions of employment than her

male peers; subjecting her to  hostility and unfair scrutiny; subjecting Plaintiff to a hostile work

environment; taking adverse action against Plaintiff including suspending her employment,

summarily suspending and revoking her clinical privileges and ultimately removing her from federal service. and reporting her to the NPDB and the Colorado State Medical Board without following ECHCS policies and procedures.

171.    Defendant's conduct discriminated against Plaintiff on the basis of her sex and/or pregnancy  and/or national origin in violation of Title VII.

172.    As a direct and proximate result of Defendant's actions, Plaintiff has suffered damages, including lost wages and benefits, diminished reputation and other pecuniary losses, and emotional pain and suffering, mental anguish, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

### SECOND CLAIM FOR RELIEF
### (Retaliation in violation of Title VII)

173.    The foregoing allegations are realleged and incorporated herein by reference.

174.    Plaintiff participated in statutorily protected activity by opposing practices targeted at her that were unlawful under Title VII.

175.    As a result of Plaintiff's protected opposition to discrimination, Defendant retaliated against her by subjecting her to less favorable terms and conditions of employment, as described in this Complaint, including, but not limited to: subjecting Plaintiff to less favorable terms and conditions of employment than her male peers; subjecting her to  hostility and unfair scrutiny; subjecting Plaintiff to a hostile work environment; taking adverse action against Plaintiff including suspending her employment; summarily suspending and revoking her clinical privileges and ultimately removing her from federal service. and reporting her to the NPDB and the Colorado State Medical Board without following ECHCS policies and procedures.

31

176.    Defendant's conduct was retaliatory against Plaintiff and in violation of Title VII.

177.    As a direct and proximate result of Defendant's actions, Plaintiff has suffered damages, including lost wages and benefits, diminished reputation and other pecuniary losses, and emotional pain and suffering, mental anguish, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

## THIRD CLAIM FOR RELIEF
### (Disability Discrimination in Violation of the ADA and the Rehabilitation Act)

178.    The foregoing allegations are realleged and incorporated herein by reference.

179.    At all times relevant herein, Plaintiff was an individual with a disability under the Rehabilitation Act.

180.    Plaintiff was able and qualified to perform her essential job duties with or without a reasonable accommodation.

181.    It follows that, during her employment with Defendant, Plaintiff has been a qualified individual with a disability under the Rehabilitation Act.

182.    Defendant has discriminated against Plaintiff because of her disability, in violation of the Rehabilitation Act, by, among other things: failing to provide Plaintiff with reasonable accommodations; failing to respond to Plaintiff's requests for reasonable accommodations and otherwise failing to engage in the interactive process in good faith; taking adverse action against Plaintiff including suspending her employment; summarily suspending and revoking her clinical privileges and ultimately removing her from federal service. and reporting her to the NPDB and the Colorado State Medical Board without following ECHCS policies and procedures.

183.    As a direct and proximate result of Defendant's actions, Plaintiff has suffered

damages, including lost wages and benefits, diminished reputation and other pecuniary losses,

and emotional pain and suffering, mental anguish, inconvenience, loss of enjoyment of life, and

other non-pecuniary losses.

**FOURTH CLAIM FOR RELIEF**
**(Retaliation in Violation of the ADA and the Rehabilitation Act)**

184.    The foregoing allegations are realleged and incorporated herein by reference.

185.    Plaintiff participated in statutorily protected activity by requesting reasonable

accommodations and opposing practices targeted at her that were unlawful under the

Rehabilitation Act.

186.    As a result of Plaintiff's protected opposition, the VA retaliated against her as

described in this Complaint by, among other things: ignoring Plaintiff's requests for reasonable

accommodations; taking adverse action against Plaintiff including suspending her employment;

summarily suspending and revoking her clinical privileges and ultimately removing her from

federal service. and reporting her to the NPDB and the Colorado State Medical Board without

following ECHCS policies and procedures.

187.    As a direct and proximate result of Defendant's actions, Plaintiff has suffered

damages, including lost wages and benefits, diminished reputation and other pecuniary losses,

and emotional pain and suffering, mental anguish, inconvenience, loss of enjoyment of life, and

other non-pecuniary losses.

**DEMAND FOR JUDGMENT**

WHEREFORE, Plaintiff Dr. Elizabeth Schacht respectfully requests that this Court enter

judgment in her favor and against the Defendant, and award her all relief as allowed by law

including, but not limited to:

a.  Retroactive appointment to her position  as an anesthesiologist;

b.  Back pay and all attendant benefits;

c.  Front pay and all attendant benefits;

d.  Compensatory damages including, but not limited to, those for emotional

distress, loss of reputation and embarrassment;

e.  Pecuniary damages for losses and expenses incurred as a result of the

discriminatory and retaliatory treatment;

f.  Restoration of all leave hours Plaintiff used due to the effects of the

discriminatory and retaliatory conduct;

g.  Pre-judgment and post-judgment interest at the highest lawful rate;

h.  Tax enhancement;

i.   Attorney fees and costs;

j.  Expungement of all negative information from Plaintiff's Official

Personnel File;

k.  Injunctive and declaratory relief; and

l.  Such other and further relief as justice allows.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE**

Respectfully submitted this 20th day of March 2023.

*s/Madeline A. Collison*
Madeline A. Collison

34

Benezra & Culver, P.C.
733 17th Street, Suite 1450
Denver, Colorado 80202
(303) 716-0254
(720) 838-4632 (cell)
mcollison@bc-law.com


Marisa L. Williams
Williams & Rhodes LLP
7887 E. Belleview Ave. #1100
Englewood, CO 80111
303-220-0303
303-840-7370 (fax)
Mlw@williamsandrhodes.com

Plaintiff's address:
27 Oneida Court
Denver, Colorado 80230

## CERTIFICATION OF GOOD STANDING

I hereby certify that I am a member in good standing of the bar of this Court.


_s/Madeline A. Collison_
Madeline A. Collison
Benezra & Culver, P.C.
733 17th Street, Suite 1450
Denver, Colorado 80202
(303) 716-0254
(720) 838-4632 (cell)
mcollison@bc-law.com