IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Case No. 23-cv-00709-PAB-SBP

ELIZABETH SCHACHT, M.D.,

Plaintiff,

v.

DOUGLAS A. COLLINS, Secretary, U.S. Department of Veterans Affairs,[1]

Defendant.

---

**ORDER**

---

This matter is before the Court on Defendant's Motion for Summary Judgment [Docket No. 143]. Plaintiff Elizabeth Schacht, M.D. filed a response. Docket No. 154. Defendant Douglas A. Collins, sued in his official capacity as the Secretary of the United States Department of Veteran Affairs (the "VA"), filed a reply. Docket No. 159. The Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## I. UNDISPUTED FACTS[2]

Dr. Schacht was employed at the Rocky Mountain Regional Veterans Affairs Medical Center (the "Denver VA") in Aurora, Colorado between March 2015 and August 20, 2018. Docket No. 143 at 1, ¶ 1; Docket No. 154 at 7, ¶ 1. Dr. Schacht was the only Colombian, only female, and only Latina anesthesiologist at the Denver VA. Docket No. 154 at 7, ¶ 1. Dr. Schacht was licensed in 2010 and is board certified in

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Secretary Collins is automatically substituted as the defendant as the current United States Secretary of Veterans Affairs.

[2] The following facts are undisputed unless otherwise noted.

Anesthesiology, Critical Care medicine, and Advanced Perioperative Transesophageal Echocardiology. *Id.*, ¶ 2. Dr. Schacht provided anesthesia services in the Surgery Department, the Cardiac Care Team, and the Surgical Intensive Care Unit ("SICU"). *Id.*, ¶ 4. Dr. Schacht was responsible for supervising residents and nurse anesthetists. Docket No. 143 at 3, ¶ 16. Dr. Schacht's job responsibilities also included working "closely" with other members of the care team and maintaining courteous and cooperative relationships with her coworkers. *Id.*, ¶ 17. Dr. Schacht has no malpractice claims or adverse patient outcomes. Docket No. 154 at 7, ¶ 3. She has never been sanctioned by a state licensing board or had a patient complaint substantiated. *Id.*

The Denver VA is a facility that provides the highest level of care within the VA. Docket No. 143 at 1, ¶ 2. Sallie Houser-Hanfelder was the Director of the VA Eastern Colorado Health Care System from 2016 through May 2019. *Id.* at 2, ¶ 3. Ms. Houser-Hanfelder was not a doctor and relied on the expertise of the Denver VA's Chief of Staff and Deputy Chief of Staff for matters related to privileging and credentialing for physicians at the Denver VA. *Id.*, ¶ 4. Dr. Ellen Mangione was the Chief of Staff at the Denver VA from December 2006 through September 2018. *Id.*, ¶ 5. Dr. Harold Dillon was the Deputy Chief of Staff at the Denver VA from 2016 to October 2018. *Id.*, ¶ 6. Dr. Schacht's supervisors included Ms. Houser-Hanfelder, Dr. Mangione, Dr. Dillon, and Dr. Black. Docket No. 154 at 7, ¶ 5.

The Denver VA is affiliated with the University of Colorado School of Medicine ("CU") and CU medical residents do rotations at the Denver VA. Docket No. 143 at 2, ¶ 7. Dr. Anthony Oliva was the residency program director in CU's anesthesiology department during the relevant time period. *Id.*, ¶ 9.

In October 2016, Dr. Schacht met with her supervisor, Dr. Gurdev Rai, who informed her that staff with the Intensive Care Unit had complained about her. *Id.* at 4, ¶ 21.[3] Also in 2016, Dr. Rai told Dr. Mangione that there were some challenges with Dr. Schacht. *Id.*, ¶ 22.

On February 24, 2017, Dr. Schacht received annual evaluations from CU residents. *Id.*, ¶ 23. Dr. Schacht's scores in the residents' evaluations were generally lower than her peers' scores. *Id.*, ¶ 24.[4] In the categories of "ability to teach procedures" and "availability," her scores were two standard deviations lower than her peers. *Id*. The resident evaluations included comments that Dr. Schacht "was not available at crucial times of the case" and should work on "[b]etter communication." *Id.*, ¶ 25.

In March and April 2017, Dr. Dillon heard concerns from VA employees about Dr. Schacht's "practice and her presence, whether . . . she was there or not there or whether she was attentive to phone calls or pages." *Id.*, ¶ 26.[5] In June 2017, Dr. Rai

---

[3] Dr. Schacht admits that she met with Dr. Rai in October 2016, but denies the remainder of the VA's assertion because Dr. Schacht "did not recall the specifics but recalled there was a lot of issues in the ICU and there were complaints about her and a lot of different physicians." Docket No. 154 at 2, ¶ 21. This does not dispute the VA's assertion that Dr. Rai told her during the meeting that there were complaints about her from the ICU staff. Accordingly, the Court deems this fact admitted.

[4] Dr. Schacht denies this assertion, arguing that it includes, "not facts, but counsel's interpretation of the numbers reflected therein." Docket No. 154 at 2, ¶ 24. The Court finds that this assertion is supported by the evidence cited by the VA. In her deposition, the VA's counsel asked, regarding the evaluations, "So for ability to teach procedures and availability, both of those are two standard deviations lower than your peers, correct?" Docket No. 159-2 at 43, 172:6-9. Dr. Schacht responded, "Yes." *Id.* Accordingly, the Court deems this fact admitted.

[5] Dr. Schacht denies this assertion, arguing that Dr. Dillon heard concerns regarding another physician, which "started to surface in March or April," and that he "learned some people also had concerns with Dr. Schacht." Docket No. 154 at 2, ¶ 26.

forwarded Dr. Schacht additional complaints that he had received from VA employees about her. *Id.*, ¶ 27.[6] In September 2017, CU's anesthesiology chair, Dr. Vesna Todorovic, told Dr. Mangione that she had received a lot of complaints from residents about Dr. Schacht and that CU had previously asked Dr. Schacht not to work at its medical center. *Id.*, ¶ 28. Sometime after September 2017, Dr. Oliva collected information from residents about Dr. Schacht. *Id.* at 4-5, ¶ 29; Docket No. 154 at 8, ¶ 18. The residents complained about Dr. Schacht's lack of professionalism and stated that they "felt they didn't have anybody to supervise them, be available for them for certain issues for time periods that were unacceptable." Docket No. 143 at 4-5, ¶ 29. Approximately one-third of the residents surveyed stated they would not want to work with Dr. Schacht even if she underwent remedial training and education. *Id.* at 5, ¶ 30.

In mid-November 2017, Dr. Ian Black became Chief of Anesthesiology and Dr. Schacht's supervisor. *Id.*, ¶ 32. During his first two weeks in the position, Dr. Black informed Dr. Schacht that he "had heard some rumblings of issues with residents." *Id.*, ¶ 33. Dr. Black also began receiving complaints about Dr. Schacht from "a host of people," including residents, nurses, and surgeons. *Id.*, ¶ 34. Dr. Black's impression of Dr. Schacht was that she was defensive when receiving feedback and that, "regardless

---

This does not dispute the VA's assertion. Accordingly, the Court deems this fact admitted.

[6] Dr. Schacht denies this assertion, arguing that she "didn't recall receiving, reading the email or speaking with Rai about complaints" and "a month earlier, Rai [ ] completed her Evaluation form reflecting that she met every performance factor." Docket No. 154 at 3, ¶ 27. This does not dispute the VA's assertion that Dr. Rai forwarded these complaints to Dr. Schacht, which is supported by the evidence submitted by the VA. *See* Docket No. 143-9 at 108. Accordingly, the Court deems this fact admitted.

of who was making the complaint or what the complaint was that it was always somebody else's fault." *Id.*, ¶ 36.

On December 13, 2017, CU sent Dr. Black a letter stating that CU residents could no longer work under Dr. Schacht's supervision. *Id.* at 5-6, ¶ 38. The CU letter stated that at least 16 residents raised concerns about Dr. Schacht's failure to be available for "critical parts" of anesthetic care and her "poor professionalism with care team members" that created a "hostile work environment for resident education." *Id.* at 6, ¶ 39. The complaints concerned Dr. Schacht's conduct from May 2016 to October 2017. *Id.*, ¶ 40. Dr. Black, who had 12-14 years of experience working with residents, had "never seen nor heard of" anything like the CU residents' complaints about Dr. Schacht. *Id.*, ¶ 41. In Dr. Mangione's experience, the resident letters and CU letter were unprecedented. *Id.*, ¶ 42.

In 2017, management initiated a Focused Clinical Care Review ("FCCR") into Dr. Schacht's privileges. Docket No. 154 at 9, ¶ 21. The reviewers conducting the FCCR concluded that Dr. Schacht had met the standard of care. *Id.* Dr. Mangione believed that, because the FCCR had not made findings of substandard care by Dr. Schacht, the FCCR could not be used to terminate her. *Id.*, ¶ 22.

Beginning in December 2017, Dr. Black conducted an informal investigation to determine whether employees in the anesthesia department had witnessed similar behavior from Dr. Schacht as described in the CU letter. Docket No. 143 at 6, ¶ 43.[7]

[7] Dr. Schacht disputes this assertion, arguing that the "fact-finding investigation Black conducted did not start until after February 14, 2018, the day Schacht filed her [Equal Employment Opportunity ("EEO")] Complaint and the same day the VA summarily suspended her privileges." Docket No. 154 at 4, ¶ 43. However, this does not dispute the VA's assertion that the informal investigation began in December 2018.

Dr. Black's practice was to offer overtime for employees to complete a variety of investigative tasks, including for employees to participate in investigations. *Id.*, ¶ 44. In December 2017, Dr. Schacht took at least two weeks of vacation and was provided the CU letter when she returned in 2018. *Id.* at 7, ¶ 50.

On December 19, 2017, Dr. Schacht discussed a patient with Dr. Carlton Barnett, a VA surgeon. *Id.* at 6, ¶ 45. Dr. Barnett had no authority over Dr. Schacht's duties or benefits. *Id.* at 7, ¶ 49. Dr. Schacht felt that Dr. Barnett was aggressive and hostile towards her in front of patients, visitors, and staff. *Id*. at 6, ¶ 45. Dr. Schacht believes that, following this incident, Dr. Barnett wrote unprofessional remarks about her in the patient's chart. *Id.*, ¶ 46. Two days later, Dr. Schacht wrote an email to Dr. Black regarding the incident with Dr. Barnett. *Id.* at 7, ¶ 47; Docket No. 154 at 9, ¶ 23. On December 22, 2017, Dr. Schacht filed an informal EEO complaint alleging sex and national origin discrimination regarding the incident. Docket No. 154 at 9, ¶ 24.

In early 2018, Dr. Schacht, who had become pregnant in 2017, developed placenta previa, which she considered to be a disability. Docket No. 143 at 7, ¶ 51. In January 2018, Dr. Schacht contacted Dr. Black, informing him that she was pregnant and requesting a reasonable accommodation that asked for modified hours and to avoid heavy lifting and pushing. *Id.*, ¶ 52; Docket No. 154 at 9, ¶ 25. Despite Dr. Schacht's accommodation requests, she was assigned to cases involving radiation and requiring a heavy weighted apron. Docket No. 154 at 9, ¶ 26.

---

The VA also submits evidence showing that the informal investigation began in December 2017 while the formal investigation, as Dr. Schacht notes, did not begin until February 2018. *See* Docket No. 143-7 at 21-23, 155:15-157:1. Accordingly, the Court deems this fact admitted.

In January and February 2018, Dr. Black considered issuing a letter of counseling to Dr. Schacht. *Id.*, ¶ 27. In early 2018, as Dr. Black worked with Human Resources to draft a counseling statement and remediation plan for Dr. Schacht, "more complaints came in and both the number of complaints and acuity of complaints increased to such an extent" that Dr. Black felt that patient safety could be affected. Docket No. 143 at 7, ¶ 56.[8] Dr. Black described the level of complaints received as a "sheer bombardment of concern that people had working" with Dr. Schacht. *Id.*, ¶ 57. Dr. Black received complaints about Dr. Schacht from "ICU, ICU nurses, surgeons, carid surgeons, some of her colleagues, some CRNAs, gastroenterology, [and] gastroenterology nurses." *Id.* at 8, ¶ 58.

Based on the negative information about Dr. Schacht, Dr. Black recommended to Dr. Mangione and Dr. Dillon that Dr. Schacht's clinical privileges be summarily suspended based on "multiple factors that all combined together, where both communication and conduct potentially affected patient care and patient outcomes." *Id.*, ¶ 59. According to Dr. Black, Dr. Schacht's communication issues created safety concerns given that some subordinates were "afraid to communicate with her because they felt her responses were hostile and derogatory" while some subordinates "stopped communicating with her because of her responses," and in a "team environment, that

[8] Dr. Schacht disputes this assertion, arguing that "Black drafted a Letter of Counseling but changed his plan after Schacht filed a formal EEO complaint." Docket No. 154 at 4, ¶ 56. This does not dispute the VA's assertion that Dr. Black drafted the letter. Dr. Schacht states that she denies the "remainder" of the VA's assertion, but does not explain the basis for her dispute or cite evidence in support. *See id.* Accordingly, the Court deems this fact admitted.

communication at all levels is paramount." *Id.*, ¶ 60. Dr. Mangione believed that Dr. Schacht's conduct risked patient harm. *Id.*, ¶ 61.

On February 14, 2018, Dr. Schacht filed her formal EEO Complaint. Docket No. 154 at 10, ¶ 34. That same day, the VA issued Dr. Schacht a notice of suspension signed by Ms. Houser-Hanfelder. Docket No. 143 at 8, ¶ 62. The notice explained that "concerns have been raised to suggest that aspects of your clinical practice do not meet the accepted standards of practice and potentially constitute an imminent threat to patient welfare. This decision is based on multiple reports from peers, nurses, and residents suggesting serious clinical performances and conduct concerns, including but not limited to coordination of care and clinical communication." *Id.* The notice gave Dr. Schacht fourteen days to submit a response. *Id.*, ¶ 63. Dr. Schacht, who was represented by counsel regarding her suspension, timely provided a response to the notice. *Id.* at 9, ¶ 67. Dr. Black began a formal fact-finding investigation. *Id.*, ¶ 68.

On March 15, 2018, Dr. Schacht was hospitalized due to pregnancy-related complications. *Id.*, ¶ 70. After Dr. Schacht was released from the hospital, she was put on bedrest until she delivered her baby on May 2, 2018. *Id.*, ¶ 71. For that period of time, Dr. Schacht took leave pursuant to the Family Medical Leave Act ("FMLA") because she could not work. *Id.* Dr. Schacht submitted an accommodation request to stay Dr. Black's fact-finding investigation due her pregnancy complications. *Id.*, ¶ 72. The VA issued a decision stating that fact-finding would not be completed until Dr. Schacht was given an opportunity to participate after the birth of her child and "[t]he processes will be 'stayed' to the extent necessary to give you this opportunity to

participate after the birth for your child." *Id.*, ¶ 73.[9] Dr. Schacht voluntarily went to the VA to "gather additional information to present" her case while she was on FMLA leave. *Id.* at 9-10, ¶ 74. The VA did not "compel" Dr. Schacht to do so. *Id.*[10]

---

[9] While Dr. Schacht disputes this assertion to the extent it represents "that the entire investigation was stayed" and cites the Accommodation Request Determination in support, *see* Docket No. 154 at 5, ¶ 73 (citing Docket No. 154-8), she does not explain how the Accommodation Request Determination disputes the VA's assertion. Accordingly, the Court deems this fact admitted.

[10] Despite admitting the VA's assertion that the VA did not compel Dr. Schacht to go to the Denver VA while on FMLA leave, *see* Docket No. 143 at 9-10, ¶ 74; Docket No.154 at 5, ¶ 74, in her Additional Statement of Disputed Facts, Dr. Schacht asserts that she "could not remain on bed rest because she had to travel to the hospital to secure letters of support and documentation." Docket No. 154 at 11, ¶ 38. Dr. Schacht cites her declaration in support. *See id.* (citing Docket No. 154-1 at 7, ¶ 31). "[C]ourts will disregard a contrary affidavit when they conclude that it constitutes an attempt to create a *sham fact issue.*" *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 973 (10th Cir. 2001) (citation omitted). "To determine whether a contradicting affidavit seeks to create a sham fact issue, we have looked to three factors: whether: '(1) the affiant was cross-examined during his earlier testimony; (2) the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence; and (3) the earlier testimony reflects confusion which the affidavit attempts to explain.'" *See id.* (citation omitted). The Court finds that Dr. Schacht's affidavit directly contradicts her deposition testimony. In her deposition, Dr. Schacht was asked, "is there anything else that the VA did that you felt required you to go to the hospital or to the Denver VA while you were on FMLA leave?". Docket No. 159-2 at 53, 213:19-22. Dr. Schacht responded, "[t]he VA didn't compel me to go to the VA. I felt it was necessary to gather additional information to present my case." *Id.* at 213:23-25. Dr. Schacht's deposition testimony stating that she voluntarily went to the Denver VA while on FMLA leave contradicts the statement from her declaration that she "*had* to travel to the hospital several times to secure letters of support and submit documentation." Docket No. 154-1 at 7, ¶ 31 (emphasis added). The *Ralston* factors weigh in favor of finding that Dr. Schacht is attempting to create a sham fact issue. First, Dr. Schacht was cross-examined and was given the opportunity to clarify her testimony. Second, Dr. Schacht's declaration is based only on her own reflection, and not on newly discovered evidence. Finally, Dr. Schacht's prior testimony is not ambiguous, and the declaration seeks to contradict, not clarify, Dr. Schacht's testimony. Therefore, the Court finds that Dr. Schacht's declaration is not a basis to find that there is a dispute of fact regarding whether the VA forced Dr. Schacht to go to the Denver VA while on FMLA leave. *See Ralston*, 275 F.3d at 973.

As a result of the fact-finding investigation, Dr. Black believed that revocation of Dr. Schacht's privileges and removal from service were appropriate "based on the number of complaints and based on [Dr. Schacht] not acknowledging any fault with the complaints, based on the pattern of behavior, based on the disruptive nature of some of these actions," and the "potential for future harm." *Id.* at 10, ¶ 75. When a physician's privileges are revoked, the service chief who supervises the physician makes the recommendation, which is then voted on by the Professional Standards Council ("PSC"). *Id.*, ¶ 76. The PSC is comprised of the Chief of Staff, the chairs of major departments, and representatives from HR and quality management. *Id*. The Director, Ms. Houser-Hanfelder, had to sign off on the recommendation from the PSC. *Id.*, ¶ 77.

When the PSC convened on July 23, 2018, Dr. Black recommended that Dr. Schacht's privileges be revoked. *Id.*, ¶ 78. Dr. Black provided a variety of information to the PSC about Dr. Schacht, including his mistaken belief that Dr. Schacht had undergone a Focused Professional Practice Evaluation ("FPPE") for cause. *Id.*, ¶ 79. Dr. Black believed that Dr. Schacht had undergone an FPPE for cause based on information he had received from administrative officials. *Id.*[11] By unanimous vote, the PSC recommended that Dr. Schacht's privileges be revoked. *Id.*, ¶ 80.

On August 1, 2018, Dr. Mangione proposed Dr. Schacht's removal from service based on a charge of unprofessional conduct. *Id.* at 10-11, ¶ 81.[12] The charge was

---

[11] Dr. Schacht admits that Dr. Black "misrepresented that Schacht had been placed on an FPPE for cause," but denies "the remaining allegations." Docket No. 154 at 5, ¶ 79. Dr. Schacht does not explain the basis for her dispute. While Dr. Schacht cites the minutes from the July 23, 2018 PSC meeting, she does not explain why this supports her denial. Accordingly, the Court deems this fact admitted.

[12] The VA clarifies that "[r]evocation of privileges" is different from "removal from service." Docket No. 143 at 10 n.3.

based on eight specifications, seven of which involved specific incidents of patient care and one of which concerned Dr. Schacht's interactions with CU residents. *Id.* The patient-related specifications related to incidents where Dr. Schacht showed an inability to communicate and work with operating room colleagues. *Id.*, ¶ 82. Dr. Mangione believed that Dr. Schacht's "impatience, her demanding demeanor, her failure to communicate effectively with the residents, be available to them when they needed her assistance and her supervision were all very detrimental to the resident experience and the patient care as a result." *Id.*, ¶ 83. In support of the proposed removal, Dr. Mangione prepared an analysis of aggravating and mitigating factors. *Id.*, ¶ 84. Dr. Mangione believed that "[i]t was not possible" for Dr. Schacht "to rehabilitate herself." *Id.*, ¶ 85.

On August 20, 2018, Ms. Houser-Hanfelder issued a written decision to remove Dr. Schacht. *Id.*, ¶ 86. In considering Dr. Mangione's analysis, Ms. Houser-Hanfelder sustained three of the specifications, but did not sustain five specifications, including the one that concerned CU's residents. *Id.*, ¶ 87. Ms. Houser-Hanfelder believed that the "prevalence of the combined cases and issues in the totality make it egregious enough to warrant removal." *Id.*, ¶ 88. In deciding to remove Dr. Schacht, Ms. Houser-Hanfelder considered Dr. Mangione's analysis and conducted her own independent analysis as well. *Id.* at 11-12, ¶ 89. Ms. Houser-Hanfelder believed that removal was appropriate because Dr. Schacht did not accept responsibility for her mistakes and previous attempts to improve her communication had been unsuccessful. *Id.* at 12, ¶ 90. Ms. Houser-Hanfelder would have decided to remove Dr. Schacht regardless of whether she had a prior FPPE for cause. *Id.*, ¶ 91. The VA had received more

residents complaints about Dr. Schacht than any other physician Ms. Houser-Hanfelder had removed and more than any anesthesiologist during Ms. Houser-Hanfelder's tenure at the Denver VA. *Id.*, ¶ 92. During her tenure, Ms. Houser-Hanfelder had never received a letter from CU directing a doctor to be removed from resident supervision. *Id.*, ¶ 93.

Dr. Schacht appealed her removal to the Disciplinary Appeals Board ("DAB"). *Id.*, ¶ 94. The DAB held a hearing from December 2-5, 2019, during which it heard testimony from various witnesses, including Dr. Schacht. *Id.*, ¶ 95. Dr. Schacht was represented by counsel. *Id.*, ¶ 96. Dr. Schacht testified before the DAB, "I can see in retrospect my communication style was not the most effective in a clinical setting." *Id.*, ¶ 98.

The DAB upheld her removal, finding that "[t]estimony during the hearing clearly depicts [Plaintiff] had unprofessional conduct especially in communication or lack therefore . . . [Plaintiff's] failure to effectively communicate put the agency and the patients at unnecessary risk." *Id.*, ¶ 99. The DAB found that "[r]eceiving such a large number of negative feedback responses from residents is highly unusual" and that "[Plaintiff's] communication style created a toxic environment resulting in, in some cases, surgeons cancelling surgeries because she is the anesthesiologist or delaying major surgeries if she was covering the ICU." *Id.* at 13, ¶ 100. The DAB "acknowledge[d] that there was no . . . FPPE for cause and the reason for the FPPE was administrative error. Having said that, the [PSC] did not rely solely on [the] FPPE for cause, but also on inappropriate personal conduct. They also put into consideration the very unusual CU decision to fire [Plaintiff] from supervising residents." *Id.*, ¶ 102.

Dr. Schacht appealed the DAB's decision to the U.S. District Court for the District of Columbia, which upheld her removal. *Id.*, ¶ 104. The court found that "the DAB generally comported with the relevant substantive standards, and that each individual specification is supported by substantial evidence in the record." *Id.*, ¶ 105. The court found that the DAB's decision relied "on a wealth of testimony – in some cases concessions from [Plaintiff] herself – about her failure to communicate properly, as well as complaints from colleagues and residents on that subject." *Id.*, ¶ 106. The court also found that Dr. Schacht "was allowed to cross-examine the agency's witnesses – including on issues of bias and inconsistency." *Id.* at 13-14, ¶ 107.

Dr. Schacht argued before the district court that the DAB failed to consider that she was removed in retaliation for her request for a pregnancy-related accommodation. *Id.* at 14, ¶ 108. The court found that "the record contains substantial evidence that either predates the alleged motivation to retaliate and/or comes from sources uninvolved in [Plaintiff's] other disputes. This evidence includes below-standard resident reviews from mid-2017, as well as contemporaneous emails from colleagues memorializing complaints about [Plaintiff's] conduct with patients." *Id.*, ¶ 109. In addition, the court found that Plaintiff's "counsel also cross-examined several witnesses about any alleged sources of bias, putting that issue squarely before the Board." *Id.*, ¶ 110. The court found that the DAB "did not fail to account for any allegedly improper motivation when it independently reviewed the agency's decision." *Id*., ¶ 111. The court also found "the DAB reasonably concluded that [Plaintiff's] lack of communication was anything but 'minor.' There was extensive evidence in the record that her conduct

put patients at risk and created a difficult work environment for her colleagues," and "the scope of [Plaintiff's] conflict with her coworkers was highly unusual." *Id.*, ¶ 113**.**

Dr. Schacht appealed to the D.C. Circuit, which upheld her removal. *Id.*, ¶ 114. The D.C. Circuit found that, by "fall 2017, [her] colleagues had reported consistent and serious problems with her patient care, professionalism, and communication." *Id.*, ¶ 115. Dr. Black, Dr. Mangione, and Ms. Houser-Hanfelder never made comments to Dr. Schacht about her gender, pregnancy, or national origin. *Id*. at 15, ¶ 116. When the VA fired Dr. Schacht, it informed her she had the right to file with both the DAB and the EEOC. Docket No. 154 at 13, ¶ 63. Throughout the DAB process and before the D.C. courts, the VA maintained that the DAB does not have jurisdiction over discrimination claims. *Id.*

Dr. Douglas Semian worked with Dr. Schacht in the SICU. *Id.* at 11, ¶ 43. Dr. Semian is a male of United States origin, subject to the same performance and conduct standards as Dr. Schacht, and has no known disabilities or EEO complaints. *Id.* Multiple complaints about Dr. Semian were sent to the Chiefs of Anesthesiology including Dr. Rai, Dr. Shockley, and Dr. Black. *Id.*, ¶ 44. For instance, on August 16, 2016, SICU staff complained about their inability to communicate with Dr. Semian. *Id.*[13]

[13] The VA disputes this assertion, arguing that the "email cited is inadmissible hearsay." Docket No. 159 at 5, ¶ 44. Dr. Schacht cites an email sent from Angel Dancho, Nurse Director at the Denver VA, to Dr. Rai and Dr. Soong, wherein Ms. Dancho describes concerns "about Dr. Semian's lack of responsiveness to the RNs." Docket No. 154-32. She stated, "[t]his is creating an unsafe environment where the RNs feel that they do not have adequate coverage at night." *Id.* The Court finds that this email is admissible. "Hearsay" is defined as a statement that "the declarant does not make while testifying at the current trial or hearing" and that a "party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Therefore, a statement that is not offered for the truth of the matter asserted, but rather offered to show the effect that the statement had on the listener, is not

On September 6, 2017, there were reports of Dr. Semian's altercation with another member of the Critical Care team in front of a patient's family. *Id.*, ¶ 45.[14] On September 29, 2017, Dr. Semian was reported for hostile behavior and concerns for patient care. *Id.* at 11-12.[15] In December 2017 and January 2018, two separate Patient Safety Reports were made to Dr. Black regarding Dr. Semian. *Id.* at 12, ¶ 47. On

---

hearsay under Fed. R. Evid. 801(c). *See Faulkner v. Super Valu Stores, Inc.*, 3 F.3d 1419, 1434 (10th Cir. 1993) ("Statements offered for the effect on the listener . . . are generally not hearsay."). Dr. Schacht is offering Ms. Dancho's statements to Dr. Rai and Dr. Soong to show the effect it had on them regarding their discipline of Dr. Semian, or lack thereof. Ms. Dancho's statements are pertinent to the Court's analysis with no regard for their truth and are therefore not hearsay. *See Futrell-Smith* v. *Brinker Int'l, Inc.*, 2026 WL 2592970, at *5 (10th Cir. Sept. 2, 2026) (unpublished) (in race discrimination case, holding that a server's statements prompting a restaurant manager to approach the plaintiff about allegedly unpaid bills were not hearsay because, "[e]ven if Plaintiff never walked out on a bill, [the server] told [the manager] that she had and [the manager] acted on that information"). Statements are admissible to show the effect they had on the listener in making employment decisions. *See Faulkner*, 3 F.3d at 1434 (holding that the defendant's "business justifications" for refusing to hire the plaintiffs were "nonhearsay testimony" because the business justifications were used to show the effect it had on the defendant's decision not to hire the plaintiffs); *Velez v. SCL Health-Front Range, Inc.*, No. 14-cv-02179-PAB-CBS, 2015 WL 9315574, at *2 & n.2 (D. Colo. Dec. 23, 2015) (finding that an email that raised "concerns about plaintiff's performance" was not inadmissible hearsay because it was "not offer[ed] . . . to prove the truth of [the] criticism of plaintiff, but rather offer[ed] to show the effect on the listener," the employer). The Court rejects the VA's argument that there is no evidence that the multiple incidents were reported to Dr. Rai, Dr. Shockley, and Dr. Black; the VA admitted this in its answer. *See* Docket Nos. 29 at 19, ¶ 100; Docket No. 75 at 12, ¶ 100. Accordingly, the Court deems this fact admitted.

[14] The Court rejects the VA's argument that Dr. Schacht relies on inadmissible hearsay for the reasons stated *supra* n.13. *See* Docket No. 159 at 5, ¶ 45.

[15] The Court rejects the VA's argument that Dr. Schacht relies on inadmissible hearsay for the reasons stated *supra* n.13. *See* Docket No. 159 at 5, ¶ 46. The VA's characterization of the September 29, 2017 incident as "one response from Dr. Semian to a question from a nurse amidst larger concerns about coverage of SICU patients" does not constitute a denial. *See id*. Accordingly, the Court deems this fact admitted.

January 17, 2018, Dr. Black proposed a 3-day suspension for Dr. Semian, which Ms. Houser-Hanfelder sustained. *Id.*, ¶ 48.[16]

On May 31, 2018, a complaint was made regarding Dr. Semian's communication. *Id.*, ¶ 50. On October 21, 2018, a complaint was filed against Dr. Semian alleging that he was hostile and engaged in unsafe behavior. *Id.*, ¶ 51. On October 26, 2018, a complaint was filed alleging ongoing issues with Dr. Semian. *Id.*, ¶ 52.[17] The VA took no further action against Dr. Semian until it suspended his privileges on February 15, 2019. *Id.*, ¶ 53.

On September 24, 2019, Dr. Semian was reported for hostile behavior, communication issues, and refusing to meet with a patient. *Id.*, ¶ 54. A fact-finding report concluded that Dr. Semian was continuing to create an unsafe working environment. *Id.* After Dr. Moore, Dr. Semian's supervisor, informed Dr. Semian that he was preparing to issue an adverse Ongoing Professional Practice Evaluation ("OPPE"), Dr. Semian chose to resign. *Id.* at 12-13, ¶ 55.

Dr. Schacht also worked in the SICU with Dr. Christoper Frandrup. *Id.* at 13, ¶ 56. Dr. Frandrup is a male of U.S. origin, subject to the same performance and conduct standards as Dr. Schacht, and has no known disabilities or EEO complaints. *Id.* The VA removed Dr. Frandrup in September 2017 for "Unprofessional Conduct." *Id.*, ¶ 57. The VA alleged that, while on call, Dr. Frandrup reported to an emergency surgery late and in an impaired state (alcohol). *Id.* The VA reinstated Dr. Frandrup to

---

[16] The VA claims that Dr. Semian's suspension was based on the altercation that occurred on September 6, 2017. *See* Docket No. 159 at 5, ¶ 48.

[17] The Court rejects the VA's argument that Dr. Schacht relies on inadmissible hearsay for the reasons stated *supra* n.13. *See* Docket No. 159 at 5, ¶¶ 50-52.

his full-time position. *Id.*, ¶ 58. In October 2018, Dr. Frandrup destroyed an anesthesia cart in the hospital. *Id.*, ¶ 61. Dr. Black defended Dr. Frandrup and no action was taken against Dr. Frandrup. *Id.*[18]

## II. PROCEDURAL BACKGROUND

On February 29, 2024, the Court granted in part and denied in part the VA's motion for partial summary judgment. Docket No. 70. The Court dismissed without prejudice (a) the portion of Dr. Schacht's first, second, third, and fourth claims that alleged the VA reported Dr. Schacht to the National Practitioner Database and the Colorado State Medical Board, *id.* at 22; (b) the portion of Dr. Schacht's second and fourth claims that alleged the VA retaliated against her for her filing an EEO complaint in 2016, for raising concerns about an internal investigation in 2017, and for raising concerns about the VA's failure to abide by the terms of a 2017 settlement agreement, *id.* at 22-23; and (c) the portion of Dr. Schacht's fourth claim that alleged the VA retaliated against Dr. Schacht by failing to provide her with reasonable accommodations related to radiation exposure. *Id.* at 23.

The VA also filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). Docket No. 37. The Court granted in part and denied in part the VA's motion to dismiss. Docket No. 71. The Court dismissed with prejudice the portion of Dr. Schacht's first claim that alleged a hostile work environment, the portion of her fourth claim that alleged retaliation under the ADA, and the portion of her third claim that alleged disability discrimination under the ADA. *Id.* at 35.

[18] The Court rejects the VA's argument that Dr. Schacht relies on inadmissible hearsay for the reasons stated *supra* n.13. *See* Docket No. 159 at 6, ¶ 61.

On August 1, 2023, Dr. Schacht filed an amended complaint pursuant to Fed. R. Civ. P. 15(a)(2). *See* Docket No. 26. In her amended complaint, Dr. Schacht asserts four claims arising out of her employment with the VA: (1) a disparate treatment claim and hostile work environment claim under Title VII of the Civil Rights Act of 1964 ("Title VII") for discrimination based on sex, pregnancy, and national origin; (2) a retaliation claim under Title VII; (3) a disability discrimination claim under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act; and (4) a retaliation claim under the ADA and the Rehabilitation Act. Docket No. 29 at 36-41, ¶¶ 161-186.

## III. LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). A disputed fact is "material" if, under the relevant substantive law, it is essential to the proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). Only disputes over material facts can create a genuine issue for trial and preclude summary judgment. *Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005). An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997). "Where . . . a defendant moves for summary judgment to test an affirmative defense, the defendant . . . must demonstrate that no disputed material fact exists regarding the affirmative defense asserted. Once the defendant makes this initial showing, the plaintiff must then demonstrate with specificity the existence of a disputed material fact.

If the plaintiff cannot meet this burden, the affirmative defense bars [his] claim, and the defendant is then entitled to summary judgment as a matter of law." *Helm v. Kansas*, 656 F.3d 1277, 1284 (10th Cir. 2011) (alterations, internal quotations, and citations omitted).

Where "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (quotations omitted). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994). The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quotations omitted). "To defeat a motion for summary judgment, the nonmovant's evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise," and "[u]nsubstantiated allegations carry no probative weight." *SEC v. GenAudio Inc.*, 32 F.4th 902, 921 (10th Cir. 2022) (citations and alterations omitted). When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *Bausman*, 252 F.3d at 1115.

## IV. ANALYSIS

Dr. Schacht's remaining claims are as follows: (1) Title VII disparate treatment for discrimination based on sex, pregnancy, and national origin; (2) Title VII retaliation

based on the filing of her informal EEO complaint on December 27, 2017 that resulted in the February 14, 2018 filing of her formal EEO complaint; (3) disability discrimination claim under the Rehabilitation Act; and (4) retaliation under the Rehabilitation Act based on her asking for reasonable accommodations. *See* Docket No. 154 at 22-25. Before turning to the merits of Dr. Schacht's claims, the Court addresses the VA's arguments that Dr. Schacht is precluded from bringing her claims.

**A. <u>Claim Preclusion</u>**

The VA argues that, "[b]ecause Plaintiff challenged her suspension and removal in the D.D.C. but did not assert any discrimination claims, claim preclusion now bars her from asserting those claims here." Docket No. 143 at 17. "The doctrine of res judicata, or claim preclusion, [ ] prevent[s] a party from litigating a legal claim that was or could have been the subject of a previously issued final judgment. . . . To apply claim preclusion, three elements must exist: (1) a final judgment on the merits in an earlier action; (2) identity of parties or privies in the two suits; and (3) identity of the cause of action in both suits." *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221, 1239 (10th Cir. 2017) (citations, quotations, and alterations omitted). Claim preclusion "is appropriate unless the party seeking to avoid preclusion did not have a 'full and fair opportunity' to litigate the claim in the prior suit." *See MACTEC, Inc. v. Gorelick*, 427 F.3d 821, 831 (10th Cir. 2005) (citation omitted). The court considers the fairness of the prior proceeding "by examining any procedural limitations, the party's incentive to fully litigate the claim, and whether effective litigation was limited by the nature or relationship of the parties." *See Watkins v. Genesh, Inc.*, 135 F.4th 1224, 1230 (10th Cir. 2025) (internal quotation and citation omitted). "Because claim preclusion is an

affirmative defense, the proponent of preclusion bears the burden to show that the three preclusion factors are satisfied, and that the full and fair opportunity exception is unavailing." *Id*. (internal quotation and citation omitted).

Dr. Schacht appealed the DAB's decision to the District Court for the District of Columbia. *See Doe v. Lieberman,* 2021 WL 4476748, (D.D.C. Sept. 30, 2021) ("*Doe I*"). Dr. Schacht challenged the sufficiency of the DAB's pre-hearing notice, *id.* at *5, the DAB's exclusion of Dr. Schacht's supplemental exhibits and expert testimony, and the decision to deny Dr. Schacht's request to cross-examine witnesses. *Id.* at *7. She also "rais[ed] several challenges to the DAB's reasoning and conclusions it reached." *Id.* at *11. *Doe I* found that "the DAB's failure to explain its evidentiary decisions regarding [Dr. Schacht's] supplemental exhibits and introduction of prior sworn testimony requires remand under the statutory standards applicable to agency adjudications," but rejected the remainder of Dr. Schacht's challenges. *Id.* at *7, *13.

On August 11, 2022, after remand, the District Court found that the DAB provided a "sufficient, reasonable explanation" for its evidentiary decisions. *See Doe v. Lieberman,* 2022 WL 3576211, at *1 (D.D.C. Aug. 11, 2022) (*"Doe II*"). *Doe II* considered Dr. Schacht's argument that the DAB's decision was not supported by substantial evidence. *See id*. at *11. The court rejected Dr. Schacht's challenge, finding that "the DAB generally comported with the relevant substantive standards, and that each individual specification is supported by substantial evidence in the record." *Id.* Dr. Schacht appealed *Doe II* to the United States Court of Appeals for the District of Columbia. *See Schacht v. Lieberman,* 103 F.4th 794 (D.C. Cir. 2024). Dr. Schacht did not challenge *Doe II*'s finding that there was substantial evidence to support each

specification, but rather "claim[ed] that the Board acted arbitrarily in refusing to admit some of her proposed evidence" and "argue[d] that the Board's decision was arbitrary and capricious because the Board did not sufficiently consider whether a penalty short of firing her would have been appropriate." *Id*. at 795. On June 4, 2024, the D.C. Circuit affirmed the judgment in *Doe II*. *Id.* at 798.[19]

Dr. Schacht argues that the DAB did not have jurisdiction to hear her discrimination and retaliation claims and, in any event, she did not have a full and fair opportunity to litigate her discrimination and retaliation claims in the DAB proceedings. *See* Docket No. 154 at 18-20. Dr. Schacht also argues that she did not have an incentive to litigate her discrimination and retaliation claims in the DAB proceedings because "1) the DAB was not qualified to decide such claims . . . 2) the DAB does not allow discovery, but the EEOC does; 3) leaving her claims at the EEOC[20] meant she

---

[19] The Court refers to Dr. Schacht's appeals of the DAB decision to D.C. District Court and D.C. Circuit as the "DAB Proceedings."

[20] "To exhaust administrative remedies, a federal employee complaining of Title VII violations may either file a charge with the EEOC (as any private-sector employee would), or, pursue a separate process through the employing agency's EEO Officer." *James v. James*, 129 F. Supp. 3d 1212, 1222 (D. Colo. 2015), *aff'd*, 656 F. App'x 429 (10th Cir. 2016) (unpublished) (citing 42 U.S.C. § 2000e–5; 29 C.F.R. § 1614.101 et seq.). Dr. Schacht pursued the EEO process under 29 C.F.R. § 1614.101, pursuant to which,

> an aggrieved employee contacts the agency's EEO Counselor within 45 days of the act of which she complains, and the Counselor then undertakes informal efforts to investigate and resolve the matter. 29 C.F.R. § 1614.105(a)(1). If the Counselor is unable to resolve the issue within a specified period, the employee has 15 days from the end of the counseling period to file a formal complaint with the agency. 29 C.F.R. § 1614.106. The agency then begins an investigation into the complaint. 29 C.F.R. § 1614.108. At the conclusion of the investigation, the agency presents the employee with a copy of the investigative file, at which point the employee may either demand a hearing before an EEOC Administrative Judge or request a final decision on the complaint from the agency. 29 C.F.R. § 1614.108(f).

would receive a hearing from a neutral third party; 4) it gave her additional opportunity to resolve the case without incurring the expense of a civil action; and 5) she would still have the opportunity to file in court." *Id.* at 18-19 (footnote added).

The Court finds that the VA has not carried its burden to show that the full and fair opportunity exception is unavailing. *See Watkins*, 135 F.4th at 1230. It is undisputed that, throughout the DAB proceedings, the VA maintained that the DAB did not have jurisdiction to consider Dr. Schacht's discrimination and retaliation claims. Docket No. 154 at 13, ¶ 63. As noted by the district court when reviewing the DAB proceedings in *Doe II,* at 2022 WL 3576211, at *11, "the agency's motivation in bringing charges against [plaintiff] is not the relevant question in this case, which addresses only whether substantial evidence supports the DAB's assessment that [plaintiff] should be removed from service." In support of its conclusion that its review was limited to whether the agency's decision was supported by substantial evidence, *Doe II* cited 38 U.S.C. § 7462(a)(1), which limits the DAB's jurisdiction to review of major adverse actions against qualifying employees. *See Doe II*, 2022 WL 3576211, at *11. While *Doe II*, in dicta, stated that the DAB record "contains substantial evidence that either predates the alleged motivation to retaliate and/or comes from sources uninvolved in

---

*James*, 129 F. Supp. 3d at 1222. Under 29 C.F.R. § 1614.109(d), Dr. Schacht has "the right to seek discovery prior to the hearing." During the discovery process,

> Both parties are entitled to reasonable development of evidence on matters relevant to the issues raised in the complaint, but the administrative judge may limit the quantity and timing of discovery. Evidence may be developed through interrogatories, depositions, and requests for admissions, stipulations or production of documents.

29 C.F.R. § 1614.109(d).

[plaintiff's] other disputes," that statement did not call into question that the DAB had jurisdiction only to consider whether Dr. Schacht's removal was supported by substantial evidence. *See id*. Accordingly, the Court finds that Dr. Schacht's claims in this case are not subject to claim preclusion.

**B. <u>Issue Preclusion</u>**

The VA argues that Dr. Schacht is "precluded from disputing issues that the DAB proceedings already resolved." Docket No. 143 at 18. Under the doctrine of issue preclusion, "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Ashe v. Swenson*, 397 U.S. 436, 443 (1970). "[I]ssue preclusion bars a party from relitigating an issue once it has suffered an adverse determination on the issue, even if the issue arises when the party is pursuing or defending against a different claim." *Park Lake Res. Ltd. Liab. v. U.S. Dep't of Agr.*, 378 F.3d 1132, 1136 (10th Cir. 2004) (citation omitted). It is designed to prevent parties from wasting time and resources, and to discourage losing parties from shopping around for a different court. *See B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 140 (2015). In general, issue preclusion applies when: (1) the issue previously decided is identical to the one presented in the action in question; (2) the prior action has been finally adjudicated on the merits; (3) the party against whom the doctrine is invoked was a party to, or in privity with, a party to the prior adjudication; and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action. *Park Lake*, 378 F.3d at 1136; *see also Stan Lee Media, Inc. v. Walt Disney Co.*, 774 F.3d 1292, 1297 (10th Cir. 2014).

On September 24, 2025, in its order granting the VA's motion to exclude pursuant to Fed. R. Civ. P. 702, the Court found that the D.D.C. – after remanding Dr. Schacht's case to the DAB for further proceedings – considered whether each specification used to justify Dr. Schacht's unprofessional conduct was supported by substantial evidence. *See* Docket No. 129 at 9-12. Furthermore, the Court found that Dr. Schacht had a full and fair opportunity to litigate the issue of there being substantial evidence to support the specifications. *Id.* 12-17. Thus, the Court found that Dr. Schacht was precluded from relitigating these issues.

Dr. Schacht argues that, "[b]ecause the DAB and the D.C. courts ruled the VA met the substantial evidence standard, this is the only issue precluded in this case." Docket No. 154 at 21. She contends that "[t]he practical effect of the DAB and D.C. courts' decisions in this case is that they satisfy the VA's burden of articulating a legitimate business reason for its actions," but that "[a]nything more would be inequitable because the substantial evidence standard is lower than the preponderance of evidence standard." *Id.* at 21-22.

As Dr. Schacht acknowledges, she is precluded from challenging that the VA had legitimate reasons for the revocation of her clinical privileges and removal. *See id.* However, the Court finds that Dr. Schacht is not precluded from arguing that these reasons were pretextual. In the Tenth Circuit, to demonstrate pretext, a plaintiff "need not show both that the defendant's reasons were a pretext *and* that the real reason was discrimination – the fact of pretext alone may allow the inference of discrimination." *Walkingstick Dixon v. Okla. ex rel. Reg'l Univ. Sys. of Okla. Bd. of Regents*, 125 F.4th 1321, 1337 (10th Cir. 2025) (citation omitted). The VA agrees that, for purposes of

defeating summary judgment, Dr. Schacht "must identify disputed facts that would show those reasons were pretextual." *See* Docket No. 159 at 11-12.

Therefore, taking into account those issues that Dr. Schcaht is precluded from challenging, for each of Dr. Schacht's claims, the VA had a legitimate, nondiscriminatory reason for its adverse actions, namely, the revocation of Dr. Schacht's privileges and her removal. Accordingly, the Court considers whether Dr. Schacht has raised a genuine dispute of material fact as to whether the reasons for the revocation of her privileges and her removal were pretextual.[21]

### C. Claim One – Title VII Disparate Treatment

Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Such claims can be demonstrated either by "direct evidence that a workplace policy, practice, or decision relies expressly on a protected characteristic" or by "using the burden-shifting framework set forth in *McDonnell Douglas [Corp. v. Green*, 411 U.S. 792 (1973)]." *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 213 (2015). Under *McDonnell Douglas*, plaintiff must first establish a *prima facie* case of discrimination. *Ibrahim v. All. for Sustainable Energy, LLC*, 994 F.3d 1193, 1196 (10th Cir. 2021). To establish a *prima facie* case of discrimination based on disparate treatment, a plaintiff

[21] In light of the VA acknowledging that Dr. Schacht can challenge whether the VA's legitimate reasons were pretextual in this case, *see* Docket No. 159 at 12, and the Court granting summary judgment for the VA on all of Dr. Schacht's remaining claims, the Court will not address the VA's argument that the Veterans Benefits Act precludes Dr. Schacht from bringing her claims. *See* Docket No. 143 at 15-17.

must show that (1) she "belongs to a protected class;" (2) she suffered an "adverse employment action;" and (3) the adverse employment action occurred under circumstances giving "rise to an inference of discrimination." *Id.*; *see also Mack v. J.M. Smuckers Co*., 2023 WL 5217705, at *4 (10th Cir. Aug. 15, 2023) (citing *Luster v. Vilsack*, 667 F.3d 1089, 1095 (10th Cir. 2011)). A plaintiff's burden at the *prima facie* stage is "not onerous." *Bennett v. Windstream Commc'ns, Inc*., 792 F.3d 1261, 1267 (10th Cir. 2015) (quoting *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)). If plaintiff establishes a *prima facie* case, the burden shifts to defendant "to articulate a legitimate, nondiscriminatory reason" for the employment action. *Id*. at 1266. If defendant provides a legitimate non-discriminatory reason, the burden shifts back to plaintiff to show "pretext." *Id*.

In regards to Claim One, the parties focus on whether Dr. Schacht has raised a genuine dispute of material fact regarding if similarly-situated employees were treated differently than Dr. Schacht.[22] *See* Docket No. 143 at 21-22; Docket No. 154 at 2-23; Docket No. 159 at 12-14. "[E]vidence that a defendant treated a plaintiff differently than similarly-situated employees is certainly *sufficient* to establish a prima facie case" and "[e]specially relevant to show pretext if the defendant proffers a legitimate, nondiscriminatory reason for the adverse employment action." *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1195 n.6 (10th Cir. 2000) (internal

[22] The VA does not contest that Dr. Schacht belongs to a protected class. *See generally* Docket No. 143. While the VA argues that the incident involving Dr. Barnett and being forced to participate in the VA's investigation while she was on FMLA leave do not constitute an adverse employment action, *see id.* at 20-21, Dr. Schacht states these incidents are not the basis for her Title VII claims. *See* Docket No. 154 at 22. Accordingly, the only element at issue at the *prima facie* stage is whether there is evidence that gives rise to an inference of discrimination.

quotation and citation omitted). "Individuals are considered 'similarly-situated' when they deal with the same supervisor, are subjected to the same standards governing performance evaluation and discipline, and have engaged in conduct of 'comparable seriousness.'" *E.E.O.C. v. PVNF, L.L.C.,* 487 F.3d 790, 801 (10th Cir. 2007) (quoting *McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006)); *see also Ibrahim*, 994 F.3d at 1196 ("Employees are similarly situated when they share a supervisor or decision-maker, must follow the same standards, and engage in comparable conduct"); *Throupe v. Univ. of Denver*, 988 F.3d 1243, 1252 (10th Cir. 2021). "Generally, to be similarly situated, employees must 'deal with the same supervisor,' because '[d]ifferent supervisors will inevitably react differently' to employee misconduct." *Luke v. Hosp. Shared Servs., Inc*., 513 F. App'x 763, 766 (10th Cir. 2013) (unpublished) (quoting *McGowan*, 472 F.3d at 745; *Kendrick v. Penske Transp. Servs., Inc*., 220 F.3d 1220, 1230 (10th Cir. 2000)); *see also Rodriguez v. Brown*, 2022 WL 3453401, at *9 n.10 (10th Cir. Aug. 18, 2022).

A "company must be allowed to exercise its judgment in determining how severely it will discipline an employee for different types of conduct." *Kendrick*, 220 F.3d at 1233. However, when comparing the relative treatment of employees, "the comparison need not be based on identical violations of identical work rules; the violations need only be of 'comparable seriousness.'" *Mann v. XPO Logistics Freight, Inc*., 819 F. App'x 585, 600 (10th Cir. 2020) (unpublished) (quoting *Kendrick*, 220 F.3d at 1233); *Ibrahim*, 994 F.3d at 1197 (noting that "violations can be comparably serious even if they involve different conduct or rules"). Plaintiff has the "burden" of demonstrating that she "is similarly situated to the employees to whom [s]he is

comparing [herself]." *Kelley v. Goodyear Tire & Rubber Co.*, 220 F.3d 1174, 1178 (10th Cir. 2000).

The VA argues that "[t]he evidence does not show that Plaintiff was treated differently than another physician based on sex, pregnancy, and national origin" and "[n]o evidence shows that any of the decisionmakers acted with a discriminatory motive in taking action." Docket No. 143 at 21. The VA also argues that there is no evidence that "any of the actions were pretext for discrimination." *Id.* The VA contends that Dr. Schacht was "suspended and removed because of an unprecedented number of complaints against her from a wide variety of individuals." *Id.* Dr. Schacht responds that "Dr. Semian engaged in far more egregious conduct than Dr. Schacht" without facing comparable discipline. Docket No. 154 at 23. Dr. Schacht states that the VA "received multiple, very serious complaints about him." *Id.*

The Court finds that, even accepting that Dr. Schacht has met her *prima facie* burden, she has failed to raise a genuine dispute of material fact as to pretext because she has not identified proper comparators.

Complaints against Dr. Schacht date back to October 2016, when Dr. Rai informed Dr. Schacht that ICU staff had complained about her. Docket No. 143 at 4, ¶ 21. In February 2017, the VA began receiving complaints about Dr. Schacht from CU residents. *Id.*, ¶ 23. The CU residents gave Dr. Schacht scores that were generally lower than her peers and commented on her lack of communication during "crucial times of the case." *Id.*, ¶ 25. The VA continued receiving complaints about Dr. Schacht from March 2017 to September 2017. *Id.*, ¶¶ 26-28. In September 2017, Dr. Oliva collected information from CU medical residents who complained about Dr. Schacht's

lack of professionalism and how they felt she was unavailable at critical times. *Id.* at 4-5, ¶ 29. One-third of residents stated that they would not want to work with Dr. Schacht even if she underwent remedial training. *Id.* at 5, ¶ 30. Dr. Black continued to receive more complaints about Dr. Schacht early 2018. *Id.* at 7, ¶ 56.

On December 13, 2017, CU sent a letter to Dr. Black informing him that CU medical residents could no longer work under the supervision of Dr. Schacht due to residents complaining of Dr. Schacht's failure to be available at critical times, her poor professionalism, and her creation of a hostile environment. *Id.* at 5-6, ¶¶ 38, 39. The CU letter was unprecedented in Dr. Black's, Dr. Mangione's, and Ms. Houser-Hanfelder's experience. *Id.* at 5-6,12, ¶¶ 38-42, 93. During Ms. Houser-Hanfelder's tenure, the VA received more resident complaints about Dr. Schacht than any other physician who had been removed and more than any anesthesiologist. *Id.* at 12, ¶ 92.

The volume of complaints against Dr. Schacht from various VA staff members and residents, over a nearly two-year timespan and which comprised almost her entire employment with the Denver VA, distinguishes her from Dr. Semian and Dr. Frandrup. The VA received approximately eight complaints regarding Dr. Semian's poor patient care, communication, and hostile behavior. *See* Docket No. 154 at 11-12, ¶¶ 44-54. The complaints against Dr. Frandrup concerned only two incidents. *See id.* at 13, ¶¶ 57, 61. The nature of the behavior was significantly different. The behavior issues with Dr. Schacht were so serious that CU, on its own, informed the VA that it was prohibiting CU medical residents from working with Dr. Schacht. The VA considered CU's decision unprecedented. The behavior of Dr. Semian and Dr. Frandrup, while serious in its own way, did not have an impact on a partner institution. Because the

alleged misconduct by Dr. Schacht was distinct, Dr. Semian and Dr. Frandrup are not proper comparators. *See Stuart v. Erickson Living Mgmt.,* No. 18-cv-01083-PAB-NYW, 2019 WL 7289016, at *9 (D. Colo. July 29, 2019), *report and recommendation adopted*, 2019 WL 5304530 (D. Colo. Oct. 18, 2019), *aff'd*, 822 F. App'x 682 (10th Cir. 2020) (unpublished) (finding that plaintiff failed to identify proper comparators where plaintiff "identifies only one to two instances of misconduct for each comparator, but the undisputed evidence reveals [plaintiff] engaged in, or at least was accused of, repeated infractions—indeed, Defendants cited a pattern of poor patient care in terminating Plaintiff"); *Braun v. St. Pius X Par.*, 509 F. App'x 750, 754 (10th Cir. 2013) (unpublished) (holding that the proposed comparator was not similarly situated because the complaints against plaintiff "were unique in scope and consequence") (citation omitted); *see also Walker v. Bd. of Regents of Univ. of Wisc. Sys.*, 410 F.3d 387, 396 (7th Cir. 2005) (holding that individuals were not similarly situated, in part, because they "were not the target of as many staff complaints" as plaintiff); *McKinney v. JB Hunt Transp. Inc.*, 193 F. App'x 373, 374 (5th Cir. 2006) (unpublished) (holding that, because plaintiff had "numerous complaints lodged against her and a number of instances of unprofessional conduct that were not common to her co-worker," plaintiff's co-worker was not similarly situated).

Dr. Schacht relies only on comparator evidence to raise a genuine dispute of material fact regarding pretext. *See* Docket No. 154 at 23 ("The evidence regarding Drs. Semian and Frandrup satisfy the pretext requirement."). Because Dr. Schacht fails to identify proper comparators, she fails to dispute the VA's legitimate reasons for the

revocation of her clinical privileges and her removal. Accordingly, the Court will grant summary judgment to the VA on Claim One.

### D. Claim Two – Title VII Retaliation

Title VII retaliation claims are analyzed under the burden-shifting framework from *McDonnell Douglas*. *See Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1315 (10th Cir. 2017). "To establish a prima facie case of retaliation, a plaintiff must show that: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse action." *Walkingstick Dixon*, 125 F.4th at 1339 (alteration and citation omitted). Once the employer provides a nonretaliatory reason for the adverse action, the plaintiff has the burden to show pretext by "produc[ing] evidence of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *See id.* at 1340 (citation omitted). In doing so, the plaintiff "need not affirmatively demonstrate that retaliatory reasons motivated the employer." *Id.* (internal quotation and citation omitted).

Even assuming that Dr. Schacht has satisfied her *prima facie* burden, she fails to raise a genuine dispute of material fact as to pretext. Dr. Schacht focuses on the temporal proximity between her protected activity and the VA's adverse actions. *See* Docket No. 154 at 24-25. Specifically, she argues that "[t]he VA's February 14, 2018 decision to suspend her privileges and place her on a detail occurred within six weeks of her filing the informal complaint, and the VA took that adverse action the very same

day she filed her formal complaint." *Id.* However, "pretext can't rest on temporal proximity alone." *Wise v. DeJoy*, 71 F.4th 744, 754 (10th Cir. 2023). Dr. Schacht is incorrect that cases preceding *Wise* have "held to the contrary." *See* Docket No. 154 at 24 n.8. Establishing temporal proximity may be sufficient to satisfy a plaintiff's burden at the prima facie stage to demonstrate causation, but the same is not true at the pretext stage. The Tenth Circuit has held that, "[a]lthough we may consider evidence of temporal proximity – typically used to establish a prima facie case – in analyzing pretext, temporal proximity alone is insufficient to raise a genuine issue of material fact concerning pretext." *Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1213 (10th Cir. 2007) (internal citations omitted). Dr. Schacht fails to recognize this principle and cites authority that concern temporal proximity at the *prima facie* stage, rather than at the pretext stage. *See* Docket No. 154 at 24 n.8. The only additional evidence Dr. Schacht relies on is her comparator evidence, which is insufficient to raise a genuine dispute of material fact as discussed above. *See id.* at 25. Accordingly, Dr. Schacht has failed to dispute the VA's legitimate reasons for its adverse actions. The Court will grant summary judgment for the VA on Claim Two.

### E. <u>Claim Three – Rehabilitation Act Disability Discrimination</u>

Discrimination claims under the Rehabilitation Act are analyzed under the *McDonnell Douglas* framework. *See Cummings v. Norton*, 393 F.3d 1186, 1189 (10th Cir. 2005). To state a *prima facie* claim for discrimination under the Rehabilitation Act, a plaintiff must establish that (1) she is disabled under the Act; (2) she is "otherwise qualified" for the position; and (3) she was discriminated against solely by reason of her disability. *Cline v. Clinical Perfusion Sys., Inc.*, 92 F.4th 926, 932 (10th Cir. 2024). After

the employer has offered a legitimate, nondiscriminatory reason for the adverse employment decision, the plaintiff must "show there is at least a genuine issue of material fact as to whether the employer's proffered legitimate reason is genuine or pretextual." *See Jenny v. L3Harris Techs., Inc.,* 144 F.4th 1194, 1198 (10th Cir. 2025) (citation omitted).

Even assuming that Dr. Schacht has satisfied her *prima facie* burden, she fails to raise a dispute regarding pretext. Again, Dr. Schacht only relies on her comparator evidence. *See* Docket No. 154 at 25 ("The comparator evidence she has presented shows both pretext and that she is entitled to an inference of discrimination because she was treated differently from other similarly situated, nonprotected employees – none of whom had a disability."). Because Dr. Schacht has failed to identify proper comparators, she cannot use this evidence to dispute the VA's legitimate reasons. Accordingly, the Court will grant summary judgment for the VA on Claim Three.

**F. <u>Claim Four – Rehabilitation Act Disability Retaliation</u>**

Retaliation claims under the Rehabilitation Act are analyzed under the *McDonnell Douglas* framework. *See Reinhardt v. Albuquerque Pub. Schs. Bd. of Educ.*, 595 F.3d 1126, 1131 (10th Cir. 2010). Dr. Schacht must "establish a prima facie case by showing: (1) that she engaged in protected activity; (2) that she suffered a materially adverse action by [defendant] either after or contemporaneous with her protected activity; and (3) a causal connection between the protected activity and the adverse action." *Id.* Thereafter, the burden shifts to the VA to provide a legitimate, nonretaliatory reason for the adverse action, at which point the burden shifts to Dr. Schacht to raise a dispute as to pretext. *See id.*

The VA does not contest that Dr. Schacht engaged in protected activity on January 9, 2018 by contacting Dr. Black and requesting an accommodation based on Dr. Schacht developing placenta previa during her pregnancy. Docket No. 143 at 7, ¶¶ 51-52; Docket No. 154 at 9, ¶ 25. Dr. Schacht argues that the "proximity in time between her protected activity and leave interference shows a casual connection." Docket No. 154 at 25. Thus, unlike Dr. Schacht's other claims, she does not rely on comparator evidence to demonstrate a causal connection. Furthermore, she focuses on the VA's alleged interference into her FMLA leave as the adverse action at issue.

It is undisputed that, while Dr. Schacht was on FMLA leave, the VA issued a decision stating that fact-finding would not be completed until Dr. Schacht was given an opportunity to participate after the birth of her child and "[t]he processes will be stayed to the extent necessary to give you this opportunity to participate after the birth for your child." Docket No. 143 at 9, ¶ 73 (internal quotations omitted). It is also undisputed that Dr. Schacht voluntarily went to the VA to "gather additional information to present" her case while she was on FMLA leave and that the VA did not compel her to do so. *Id.* at 9-10, ¶ 74. Dr. Schacht fails to assert any facts that disputes the VA did not interfere with her FMLA leave. Because Dr. Schacht has failed to meet her *prima facie* burden, the Court will grant summary judgment for the VA on Claim Four.

## V. CONCLUSION

It is therefore,

**ORDERED** that Defendant's Motion for Summary Judgment [Docket No. 143] is **GRANTED**. It is further

**ORDERED** plaintiff's claims are **DISMISSED with prejudice**. It is further

**ORDERED** that this case is closed.

DATED September 8, 2026.

BY THE COURT:

PHILIP A. BRIMMER
United States District Judge